[Civ. No. 36579. Second Dist., Div. One. Mar. 19, 1971.]

JAMES M. BRIDGES, Plaintiff, Cross-defendant and Appellant, v. CAL-PACIFIC LEASING COMPANY, INC., Defendant, Cross-complainant and Appellant; TIME OIL CO., Defendant, Cross-defendant and Respondent.

## COUNSEL

Mack, Bianco, Means & Mack and William A. Stone for Plaintiff, Cross-defendant and Appellant.

Gold, Herscher & Taback and Ronald J. Grueskin for Defendant, Cross-complainant and Appellant.

Gibson, Dunn & Crutcher, Chester A. Skinner and Terry G. Partin for Defendant, Cross-defendant and Respondent.

## OPINION

**LILLIE, J.**—The instant controversy had its genesis in the purchase of certain equipment for a drive-in restaurant leased in April of 1963 by defendant and cross-defendant Time Oil Company (referred to hereinafter as "Time") to Jo An and Hershel Maggard. By clause "D" of the lease, it was agreed that all improvements and fixtures would belong absolutely to the landlord (Time) upon termination of the lease for breach of any of the covenants contained therein; further, it was expressly provided that default in any contract for the payment of fixtures or equipment would be deemed a breach of the lease itself. The Maggards undertook to purchase the equipment from Krick's Metal Works, a corporation, 50 percent of whose stock was owned by plaintiff and cross-defendant Bridges, its vice president. Upon making an investigation, the company's president (Mr. Krick) found Maggards' credit to be unsatisfactory, thus he negotiated with defendant and cross-complainant Cal-Pacific Leasing Company ("Cal-Pacific") to finance the sale, culminating in a "Lease" of the equipment which was guaranteed in writing by both Bridges and Krick. Thereunder the Maggards became obligated to make 60 monthly payments ($293.96 each) totalling $17,637.60 which, with an additional payment of $277.93 at the end of that period, gave them an option to purchase the equipment

outright; previously, Cal-Pacific had paid Krick $13,362.01 for the equipment thus leased.

The Maggards operated the drive-in business under the lease until June of 1965 at which time they defaulted on their payments to Time; later that same month Time secured a judgment against the Maggards whereunder the equipment was restored to Time as the rightful owner thereof. Time having unavailingly demanded payment of the judgment from Krick as guarantor of the lease, it also secured judgment against him for a sum representing the Maggards' unpaid rental; the same judgment also declared that Time's right to ownership and possession of the equipment had vested absolutely.

After the Maggards' eviction in June of 1965, Krick and Bridges arranged with Earl and Annette Warren to assume the real property lease. Three months later (September 1965) a new agreement was also entered into between the Warrens and Cal-Pacific for the "leasing" of the same equipment previously leased to the Maggards and, pursuant to which former arrangement, there had aready been paid to Cal-Pacific the sum of approximately $8,200. This new "lease" was again guaranteed in writing by Krick and Bridges. When the Warrens in the Fall of 1965 requested a rent reduction from Time, Time learned that the Warrens had begun to make payments to Cal-Pacific for the equipment. Mr. Warren was accordingly advised that Time owned the equipment, and Warren thereafter made no further payments to Cal-Pacific. As a result, and upon demand therefor, Bridges made additional payments totalling $3,809.70 to Cal-Pacific pursuant to his guaranty of the equipment lease. Subsequently he stopped making such payments and filed a complaint which initiated the present litigation.

By his complaint, as amended, Bridges sought a judicial declaration resolving the conflicting claims to the ownership of the restaurant equipment between Cal-Pacific and Time. In addition, he asked judgment against Cal-Pacific in the principal amount of all sums paid to it by mistake in the event that Time is adjudged to be the owner of the equipment; in the alternative, damages in the principal amount were sought from Time if the court finds that Cal-Pacific was the owner of the property in question, such cause of action being based on Time's asserted wrongful interference with a contractual relationship. Cal-Pacific, in turn, cross-complained against Bridges and Krick as guarantors of the defaulted "lease" and against Time for intentional inducement of breach of contract and conversion of the equipment and its residual value.

On Bridges' complaint, the court awarded a money judgment against Cal-Pacific only; on Cal-Pacific's cross-complaint, it found in favor of all

the cross-defendants named. Two appeals are before us (1) by Cal-Pacific from the adverse judgment in favor of Bridges and Time and (2) by Bridges from that portion of the judgment denying recovery from Time. As to (2), it has been represented by Bridges that the appeal is precautionary and prosecuted solely to protect him in the event of a reversal of the judgment against Cal-Pacific.

In light of the foregoing representation, in the order stated below we consider first the appeal by Cal-Pacific from the trial court's determinations which (1) ordered restitution of the sums Bridges by mistake paid to it on his guaranty and (2) denied Cal-Pacific any recovery on the demands asserted in its cross-complaint against Time. As to (1), it is contended that the evidence is insufficient to support a finding of either mistake of fact or law on Bridges' part; that such mistake, if any, was not material and not remedial in view of Bridges' failure to investigate; and finally, that such mistake was unilateral only and not compensable in damages absent intentional misleading, fraud or other unfair practices on Cal-Pacific's part. Preliminarily, we point out that recent California cases follow the more modern doctrine that mistakes of law and of fact should be treated alike (*First Sav. & Loan Assn.* v. *Bank of America,* 4 Cal. App.3d 393, 395 [84 Cal.Rptr. 532]); too, "[M]utual mistake is a common ground for restitution, and the 'innocence' of the payee does not relieve him of liability in quasi contract." (*Finnegan* v. *Spiegl Farms, Inc.,* 234 Cal. App.2d 408, 412 [44 Cal.Rptr. 645].) Cited by the court for the foregoing is the Restatement, Restitution, sections 16, 18 and 20.[1] ▮ If the mistake was a material one, upon the record here presented we are persuaded that such mistake, whether it be considered mutual or unilateral or one of law or of fact, warranted the trial court in rendering judgment for restitution of the sums paid by Bridges as guarantor.

The above disposition finds support in the following circumstances additional to those summarized earlier. Before Cal-Pacific would advance the funds to Krick's Metal Works, it demanded that Bridges guarantee the

---

[1]Section 16: "A person who has paid money to another because of an erroneous belief induced by a mistake of fact that in so doing he is performing a contract with the other which is not subject to avoidance, is entitled to restitution of the amount so paid if the transaction is voidable by either party because of the mistake and is avoided."

Section 18: "A person who has entered into a contract binding upon him and has paid money to the other party thereto under an erroneous belief induced by a mistake of fact that the terms of the contract required such payment, is entitled to restitution from the other, except where the mistake is only as to the time of payment."

Section 20: "A person who has paid another an excessive amount of money because of an erroneous belief induced by a mistake of fact that the sum paid was necessary for the discharge of a duty, for the performance of a condition, or for the acceptance of an offer, is entitled to restitution of the excess."

lease equipment with the Maggards; he was also required to furnish Cal-Pacific a personal financial statement. Bridges had not at that time (September 1963) met the Maggards, nor was he the procuring cause in obtaining the purchase of the equipment by Cal-Pacific. Krick, it appears, had asked Bridges to sign the guaranty as a personal friend. Apparently nothing was said about Cal-Pacific's ownership of the equipment when the Maggards' guaranty was signed; in that regard, Bridges testified that he "assumed Cal-Pacific Leasing bought the equipment and they owned it and I guaranteed their lease." Apparently Cal-Pacific adhered to the same view. Mr. Florman, its president, had not seen Time's ground lease, nor clause "D" thereof, but he testified that he would have gone ahead with the equipment lease regardless of that clause which, in his opinion as a layman, although with vast experience in related transactions, did not call for the construction reached by the trial court. Later, however, a letter was sent by Cal-Pacific through Krick to Time when it was learned that the equipment was being placed upon premises on which a ground lease existed. Enclosed in that letter was a document, referred to as a standard form of "landlord waiver," for Time's execution (and return to Cal-Pacific) wherein Time expressly agreed that the equipment being installed was not and would not become a part of the realty. Admittedly Cal-Pacific never was sent the signed waiver thus requested. Bridges, on his part, denied that he knew of that attempt to secure the landlord's waiver.

In September of 1965, after the Maggards vacated the premises and arrangements were made for the Warrens to take over the business and the equipment lease, Bridges again guaranteed performance to Cal-Pacific. He talked with Mr. Florman at about the time this second guaranty was signed, but nothing was said about Cal-Pacific's ownership of the equipment. From a letter from Cal-Pacific, dated January 20, 1966, he subsequently learned that the Warrens had been instructed by Time to make no further payments to Cal-Pacific in view of Time's claim of ownership of the equipment; the same letter made demand upon Bridges for payments on the equipment lease as its guarantor. After making payments in the total sum of $3,809.50, he finally consulted attorneys and the instant action was commenced. (Previously he had paid Cal-Pacific $1,689.53 following default by the Maggards, and the restitution ordered was the total of such sums.)

Presumably according credence to Bridges' testimony, the trial court made several findings which, on such factual issues of the mistakes of the parties, are conclusive here. (*Foxx* v. *Williams*, 244 Cal.App.2d 223, 232 [52 Cal.Rptr. 896].) The court also made findings that the mistakes were material, again presumably believing Bridges' testimony in that regard. Bridges properly reasoned that if he paid off Cal-Pacific pursuant to the

two guarantees, he would then be entitled to possession of the equipment and thus recoup as much of his loss as possible: "The reason I stopped making payments was because Time Oil had claimed ownership of this equipment so I went to Cal-Pacific and I said, 'There is somebody else claiming to own this equipment that I have guaranteed to lease for you, so if you cannot furnish me the equipment to do something with to have somebody operating and making these payments on this lease, then I am going to stop making payments,' which I did."

Cal-Pacific insists there was no testimony by Bridges as to why he did not discover the alleged mistake at the time he signed his guaranty—at least the second one (involving the Warrens) some considerable time later—and "He had the means of discovery." But, as stated in *American Oil Service* v. *Hope Oil Co.,* 194 Cal.App.2d 581, 587 [15 Cal.Rptr. 209], "Whether the payments were made voluntarily or through mistake depended upon the intentions of plaintiff in making them. These were to be judged in light of the facts that were known to plaintiff. Means of knowledge were not the equivalent of knowledge. We would suppose that most mistakes of fact occur through failure to resort to means of knowledge." In *Crocker-Woolworth Bank* v. *Nevada Bank,* 139 Cal. 564, 572 [73 P. 456], there is this further statement of the rule (quoting a New York case) that " 'money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of the other party that it would be unjust to require him to refund. . . .' " While Cal-Pacific does not cite the above decision, or later cases in accord therewith, we take cognizance of its stated claim that it would be inequitable to compel restitution of the monies paid by Bridges because it has only received $13,276 from all sources (Bridges, Krick, Maggard and Warren) and will thus be out of pocket some $5,499. But, as pointed out in *Crocker-Woolworth Bank, supra,* the principle referred to in the New York case becomes applicable "where equally innocent persons have dealt with one another under a mistake, . . ." (*Supra,* p. 570.) In the present case we do not have "equally innocent persons" in view of the fact, and the trial court expressly found, that Cal-Pacific made no inquiry as to the reason for Time's refusal to sign a landlord waiver nor did it make any attempt to determine the nature and extent of Time's interest in the equipment; indeed, its Mr. Florman testified that he would have gone ahead with the transaction even had he seen the ground lease and clause "D" thereof. In such circumstances Cal-Pacific proceeded at its own peril.

In light of the foregoing discussion, we need give but brief attention to the subsidiary claim that the only mistake was a unilateral one on the part of Bridges, that there was no proof that such mistake was shared

by Cal-Pacific and that any mutual mistake by the parties on the crucial matters at hand was not pleaded. The point is not well taken. Throughout the proceedings below it appears that the issue of its title to, and prior interest in, the equipment was raised by Cal-Pacific. ■ That being so, it is settled that where a case is tried on the merits, the issues are thoroughly explored during the course of the trial and the theory of the trial is known to court and counsel, an adjudication of such litigated issues is not precluded by any failure to set them forth in the pleadings. (*Collision* v. *Thomas,* 55 Cal.2d 490, 498 [11 Cal.Rptr. 555, 360 P.2d 51].)

■ Cal-Pacific makes two more claims of error, neither of which can be sustained. Considered together, they assert that declaratory relief is not warranted by the circumstances of this case because the effect of such decree is to allow a tenant to deny his landlord's title. It cannot be denied that there was a controversy between the parties involving the ownership of the restaurant equipment and Bridges' obligations as guarantor. The applicable statute (§ 1060, Code Civ. Proc.) provides that in such circumstances a party "may ask for a declaration of rights and duties, either alone or with other relief." Admittedly the granting of such relief is committed to the sound discretion of the court; but it has been held that where a multiplicity of actions would result unless the parties' rights are first declared and relief given in the same action, it is an abuse of discretion to deny the relief requested. (*California Bank* v. *Diamond,* 144 Cal.App.2d 387, 390 [301 P.2d 60].) When the instant controversy was submitted to the court for final determination it exercised sound discretion in resolving the various claims then and there existing. Nor can it be properly argued that Bridges, as a lessee, has thus been allowed to deny his landlord's title. As a matter of fact, the trial court found that while the documents were each entitled "Lease," the "economic substance of this three party transaction was a purchase and sale between the Maggards and Krick with Cal-Pacific taking an unfiled security interest in the equipment as security for its extension of credit." Furthermore, it has been held that a plaintiff is not estopped to deny his landlord's title when he was not in possession when the action was filed and where the lease was executed "through a misapprehension as to the actual title. [Citations.]" (*Stratton* v. *Hanning,* 139 Cal.App.2d 723, 727 [294 P.2d 66, 57 A.L.R.2d 344].) That is precisely the situation here.

■ For all of the foregoing reasons, the trial court properly ordered restitution of the sums paid to Cal-Pacific by Bridges; for the same reasons it correctly denied the monetary relief Cal-Pacific demanded by way of cross-complaint.

We now consider the appeal by Cal-Pacific from the denial of any relief

from Time. Clause "D" of the lease between Time and the Maggards provided that all improvements and fixtures would belong absolutely to Time (as lessor) upon termination of the lease for breach of any covenant, specifically including the breach of any contract for the payment of such fixtures. ■ Such provisions have legal sanction. "A special agreement between landlord and tenant regarding fixtures supersedes the general rules of law regulating their mutual relations and obligations. Thus, any right of a lessor or lessee under the trade fixture rule may be covenanted away, and where a contract speaks on that subject, it controls the implications that might otherwise arise under the rule.

"Probably the commonest agreement of this sort is the general stipulation that all alterations, additions, or improvements shall be property of the lessor and remain on the premises on expiration of the lease." (22 Cal.Jur.2d Fixtures, § 23, p. 289.)[2] ■ Cal-Pacific nevertheless asserts that it was a conditional vendor of the equipment and cites such cases as *Hendy* v. *Dinkerhoff,* 57 Cal. 3 and others following which hold that special agreements between landlord and tenant fixing the character of personalty affixed to the premises do not control or supersede a vendor's contract with a vendee-lessee that title to the property should remain in the seller until paid; in such circumstances, the court reasoned, the property remained as personalty, whether in the hands of the lessor or lessee, and the seller could properly proceed against the lessor for return of the property upon the lessee's default.

In the *Hendy* case the court pointed out that plaintiff knew nothing of the agreement between the lessor Dinkerhoff and the lessee Lampson, while Dinkerhoff likewise knew nothing about Hendy's leasing of a steam engine for mining operations on the former's property. In the present case, however, the trial court concluded that Cal-Pacific originally acquired its interest in the equipment with actual or constructive notice of Time's prior interest therein under clause "D" of the lease; as further shown in the companion appeal (Bridges), the court also concluded that Cal-Pacific actually was taking an unfiled security interest in the equipment as security for its extension of credit to the Maggards. If Cal-Pacific was a chattel mortgagee, it has been declared that " 'A mortgagee from a tenant has no greater right to remove trade fixtures from the premises after the tenant has surrendered possession to the landlord than the tenant himself would have.'" (*Rinaldi* v. *Goller,* 48 Cal.2d 276, 281 [309 P.2d 451].) With respect to

---

[2]Factually supporting the reasonableness of the rule in the instant proceeding was evidence that the premises were essentially unimproved when the lease was executed, the only structure being a small wooden shack. Hence, Time spent more than $5,000 in improving the property so that the operation of the restaurant could be made feasible.

notice, it has also been stated that agreements between parties (lessor and lessee) as to the character of the property in question "are binding between the parties and against third persons having actual or constructive notice thereof. . . ." (*Oroville-Wyandotte Irr. Dist.* v. *Ford,* 47 Cal.App.2d 531, 538 [18 P.2d 340].) The determinations in suit were predicated upon the foregoing principles. Since they are substantially supported by the evidence, they sustain the first of two main results reached below, namely, that ownership of the equipment was with Time and not Cal-Pacific.

■ Cal-Pacific first contends that title to the equipment did not vest under the terms of clause "D" because the actual word "equipment" is not found therein. It is provided in pertinent part that "for the breach of any one of the covenants herein obtained, all, buildings, fixtures and improvements then situated on said demised premises, shall be and belong absolutely to the said lessors. . . ." In *Peiser* v. *Mettler,* 50 Cal.2d 594 [328 P.2d 953, 74 A.L.R.2d 1], the court quoted from *Realty Dock etc. Corp.* v. *Anderson,* 174 Cal. 672, 676-677 [164 P. 4], wherein it was held that the term "improvement" was comprehensive enough to embrace all additions or alterations which might be made by the tenant for the convenience of his business upon the premises. Here, as in *Peiser,* "The parties' intention, as expressed by their written agreement, is controlling and, under their agreement 'reasonable minds cannot but agree' that the improvements here involved were covered by the provisions of the lease heretofore quoted [citation]." (*Supra,* pp. 609-610.) Also without merit is the further claim that the Maggards could only have been in default by failure to pay some third party (Krick) for the equipment. As clearly indicated therein, clause "D" provides that the improvements shall belong to Time upon "the breach of any one of the covenants herein contained" which, obviously and reasonably, includes the covenant to pay rent.

■ The trial court also found that Cal-Pacific had an unfiled security interest in the equipment as security for its extension of credit to the Maggards, the economic substance of their transaction with Krick being one of purchase and sale. Contrary to Cal-Pacific's assertion, there was evidence, albeit indirect, supporting the above conclusions which, in turn, would subordinate its claims to those of Time. In his written guaranty of the realty lease Krick stated that he was "the holder of conditional sales contracts for personal property on said leasehold . . . ." At the trial he testified that the entire series of transactions between himself, the Maggards and Cal-Pacific was "a financing arrangement." There was also testimony by Time's attorney, not objected to, that when he countersigned the Maggard-Time realty lease he learned that Krick's Metal Works had "sold their papers to a finance company."

■ The further claim by Cal-Pacific that title to the equipment had not vested in Time by virtue of the defaults in payments by both the Maggards and Krick is likewise without merit. There was testimony that the Maggards fell behind in their rent payments almost from the beginning of their occupancy; they were finally evicted, and Krick took possession of the premises under his guaranty. When he failed to make payments thereunder, Time obtained summary judgment against Krick's Metal Works; later Krick was advised by Time that it was exercising its right to terminate the lease, Krick being further advised that all buildings and improvements belonged absolutely to Time. The point is made by Cal-Pacific that Time never obtained a judgment against the Maggards which judicially terminated the lease—a judgment to such effect (June of 1965) was set aside on the ground of its rendition in the wrong county—but no authority is cited for the claim that the parties under the realty lease intended such requirement should first have been met before the vesting of title in the equipment. Indeed, as Time properly urges, "it is inconsistent for Cal-Pacific to take the position that the Maggards' rights have not been effectively terminated: If the Maggards were entitled to remain in possession of the premises and the equipment, Cal-Pacific had no right to 'lease' the equipment to the Warrens."

On the question of notice, the trial court found that at the time of the equipment "lease" Cal-Pacific knew or should have known of Time's interest in such equipment already installed on the premises; it further found that after the execution of the Maggards' equipment lease, Cal-Pacific submitted a landlord waiver to Time, that such waiver was never executed or returned, and that thereafter Cal-Pacific made no further attempt to determine the nature and extent of Time's interest. From these findings were drawn conclusions of law that Cal-Pacific originally acquired its interest in the equipment with actual or constructive notice of Time's prior existing interest; also, that when it entered into its lease with the Warrens, it still knew of Time's interest and that Time was relying on the equipment as security for its real property lease with the Warrens.
■ Cal-Pacific contends that it should not have been charged with notice, actual or constructive, of Time's interest merely because the equipment was already installed on the premises when it made its lease. But the principle is applied in California that " 'Possession of land is notice to the world of every right that the possessor has therein, legal or equitable; it is a fact putting all persons on inquiry as to the nature of the occupant's claims.' [Citation.]" (*Pacific Gas & Elec. Co.* v. *Minnette,* 115 Cal.App.2d 698, 705 [252 P.2d 642].) Much of the harshness possibly inherent in the above state of the law disappears when applied to Cal-Pacific. Its Mr. Florman testified that he had participated in some 5,000 transactions simi-

lar to the Maggard-Krick-Cal-Pacific financing arrangement. While he knew that the equipment was installed upon leased premises, he made no attempt to obtain a copy of the lease or in any way investigate its terms and conditions although he admitted his awareness of the fact that parties to a lease could validly enter into a variety of arrangements for the disposition of property brought onto the premises. As to the matter of the landlord waiver, Cal-Pacific argues that this release form was submitted to Time after its equipment lease with the Maggards had been executed, thus excusing its failure to inquire as to the reasons for its non-execution. The point is, however, that when Cal-Pacific subsequently entered into its lease with the Warrens, it then most assuredly knew of Time's interest in the equipment and was estopped to deny the latter's right to the ownership and possession thereof. More evidentiary matters could be alluded to which support our determination that the conclusions reached below should not be set aside.

 We next consider that portion of the judgment denying Cal-Pacific any damages for Time's alleged actions in intentionally inducing the Warrens to breach their contract.[3] The alleged inducement arose out of the following circumstances which are substantially without dispute: In September 1965, the Warrens commenced operation of the drive-in restaurant; they failed to earn a profit and, that same Fall, asked Time for a rent reduction;[4] at that time Time learned that Warren had begun to make payments to Cal-Pacific for the restaurant equipment; on December 28, 1965, its employee (Thompson) advised Warren that Time owned the equipment and that the Warrens should make no further payments on their equipment lease; thereafter the Warrens discontinued such payments. The trial court found that the above advice was given upon the good faith belief, based on opinion of legal counsel, that Time owned the equipment and that Cal-Pacific had no right to further payments; too, that Time gave this advice for the purpose of protecting its interest in the real property lease and to avoid a default thereon by the Warrens.

 An action will lie for the intentional and unjustifiable interference with a contractual relationship either by unlawful means or by means other-

---

[3]By another cause of action damages by way of conversion were also sought. Since such action was predicated on Cal-Pacific's asserted interest in the equipment, the damages sought were properly refused upon proof that ownership remained with Time.

[4]Bridges, who likewise sought damages from Time for the same tortious interference, although in the alternative (as earlier mentioned), quotes testimony of Warren that he could have made the payments to Cal-Pacific; but Warren did not state that he could have made such payments *and,* at the same time, kept current with Time. Bridges also asserts that there was no relationship of landlord and tenant between Time and the Warrens because the latter never received their copy of the lease. Why, it may then be asked, did they ask Time for a rent reduction?

wise lawful when there is a lack of sufficient justification or privilege. (*Herron* v. *State Farm Mutual Ins. Co.*, 56 Cal.2d 202, 205 [14 Cal.Rptr. 294, 363 P.2d 310]; *Imperial Ice Co.* v. *Rossier*, 18 Cal.2d 33, 35 [112 P.2d 631].) Justification, as pointed out in *Herron*, is an affirmative defense which Time properly pleaded in its answer; the question, therefore, is whether Time made a sufficient showing of such justification as to warrant the trial court's determinations above set forth. There are numerous decisions in this area of the law, particularly during the last decade, but none has been found which involved, as here, a trial on the merits.

After quoting at some length from the *Imperial Ice* case,[5] in *Show Management* v. *Hearst Pub. Co.*, 196 Cal.App.2d 606 [16 Cal.Rptr. 731], the court made this analysis of the rules therein set forth: " 'A thoroughly bad motive, that is, *a purpose solely to harm the plaintiff*, of course, is sufficient to exclude any apparent privilege which the interests of the parties might otherwise create, just as such a motive will defeat the immunity of any other conditional privilege. If the defendant does not act in a bona fide attempt to protect his own interest or the interest of others involved in the situation, he forfeits the immunity of the privilege. . . . *Conduct is actionable, when it is indulged solely to harm another, since the legitimate interest of the defendant is practically eliminated from consideration.* The defendant's interest, although of such a character as to justify an invasion of another's similar interest, is not to be taken into account when the defendant acts, not for the purpose of protecting that interest, but *solely* to damage the plaintiff.' " (Court's italics.) (P. 619.)

In the present case the court was confronted with the issue as to whether Time's actions were motivated solely by a desire to hurt Cal-Pacific (as well as Bridges) or whether the advice given was rendered in good faith to protect both itself and its tenant. In such circumstances, the choice of reasonable inferences was properly committed to the trial court; certainly it cannot be said that but one inference, that favoring the position of Cal-Pacific (and Bridges), could be drawn from the facts at bar. As pointed out in *Herron* (p. 206), all the circumstances must be considered in balancing the various matters and considerations therein mentioned.

As its final point, Cal-Pacific complains about the inadequacy of findings and the court's failure to render numerous findings (and two conclusions of law) proposed by it. "We have examined the findings of the trial court in the light of the critcisms made in defendant's brief and are satisfied that

---

[5]Not quoted, however, is the following statement of the law which possibly is applicable here: "Again, if two parties have separate contracts with a third, each may resort to any legitimate means at his disposal to secure performance of his contract even though the necessary result will be to cause a breach of the other contract." (18 Cal.2d at p. 37.)

the findings sufficiently dispose of all of the basic issues raised. The findings proposed by defendant, insofar as they may be deemed additional findings and are not directly contrary to the findings made, deal with evidentiary matters and, even if the matters therein were found in favor of defendant, would not require judgment in its favor." (*Coleman Engineering Co.* v. *North American Aviation, Inc.,* 65 Cal.2d 396, 410 [55 Cal.Rptr. 1, 420 P.2d 713].)

With the affirmance of the judgment in all respects as it pertains to Cal-Pacific, the claims on the appeal by Bridges from the adverse portion of the judgment involving Time must accordingly be rejected.

The judgment is affirmed, Time's costs of appeal to be borne equally by Bridges and Cal-Pacific; Bridges to recover its costs of appeal from Cal-Pacific.

Wood, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied April 14, 1971, and the petition of the defendant and appellant for a hearing by the Supreme Court was denied May 19, 1971.