Bob HAMRO, Plaintiff-Appellant,

v.

SHELL OIL CO., Defendant-Appellee.

No. 80–4257.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 15, 1981.

Decided April 12, 1982.

As Amended on Denial of Rehearing
Aug. 25, 1982.

John Hawkins, Hawkins & Donahue, San Francisco, Cal., for plaintiff-appellant.

William J. Meeske, Latham & Watkins, Los Angeles, Cal., for defendant-appellee.

Before FLETCHER and CANBY, Circuit Judges, and COPPLE,* District Judge.

## OPINION

CANBY, Circuit Judge.

Bob Hamro, a service station operator, appeals from a judgment dismissing his action against Shell Oil Company (Shell) for violations of California's antitrust statutes and for tortious interference with prospective economic advantage. The district court granted summary judgment in favor of Shell on three statutory tie-in claims and on the claim of intentional interference with prospective economic advantage. At trial, the district court granted Shell's motion for a directed verdict on the remaining statutory claim of price discrimination. We affirm.

Hamro operates a service station in San Jose, California. Shell sells petroleum products and tires, batteries and automotive accessories to wholesalers, to independent retailers, to retailers who lease their stations from Shell under franchise agreements, and to consumers through service stations owned by Shell and operated by Shell employees. On November 7, 1974, Shell entered into separate lease and dealer agreements with Hamro. On December 1, 1977, Shell and Hamro signed new lease and dealer agreements. This case arises out of the agreements and subsequent activities of Shell and Hamro.

## SUMMARY JUDGMENT

█ The trial court granted a motion for summary judgment in favor of Shell on four of the plaintiff's five claims. Despite the fact that summary judgments are commonly disfavored in antitrust cases, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *A. H. Cox & Co. v. Star Machinery Co.*, 653 F.2d 1302, 1305 (9th Cir. 1981), we conclude that the district court's grant of summary judgment in this case was proper. The record establishes that there was no genuine issue of material fact and that Shell was entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. at 467, 82 S.Ct. at 488.

### A. The Tying Claims

█ Hamro argues that genuine issues of fact have been raised with respect to two alleged tying arrangements. A tying arrangement involves a seller's refusal to sell one product (the tying product) unless the buyer also purchases a second product (the tied product) from the seller. *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed. 545 (1958); *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953); *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1211 (9th Cir. 1977). Hamro contends that as a condition of obtaining a lease of the service station premises (the tying product) from Shell he was required to purchase gasoline (the tied product) from Shell. Hamro also claims that Shell authorized him to use Shell's trademark (the tying product) on the condition that he purchase only Shell gasoline (the tied product).

### 1. Legal Standards

█ Hamro asserts that the alleged tying arrangements violate Sections 16720, 16726, and 16727 of the California Business and Professions Code, known as the Cartwright Act. Sections 16720 and 16726 of the Cartwright Act were patterned after the Sherman Act, 15 U.S.C. § 1 & 2. Section 16727 is based on section 3 of the Clayton Act, 15 U.S.C. § 14. Accordingly, federal decisions

---

* The Honorable William P. Copple, United States District Judge, for the District of Arizona, sitting by designation.

under the Sherman and the Clayton Acts are applicable to those sections of the Cartwright Act. *Younger v. Jensen*, 26 Cal.3d 397, 405 n.4, 161 Cal.Rptr. 905, 910 n.4, 605 P.2d 813, 818 n.4 (1980); *Marin County Board of Realtors, Inc. v. Palsson*, 16 Cal.3d 920, 925, 130 Cal.Rptr. 1, 3, 549 P.2d 833, 835 (1976); *Corwin v. Los Angeles Newspaper Service Bureau, Inc.*, 4 Cal.3d 842, 852–53, 94 Cal.Rptr. 785, 791, 484 P.2d 953, 959 (1971).

### 2. The Lease-Gasoline Tying Claim

■■■ To establish an illegal tying arrangement under either the Sherman Act or the Clayton Act, the plaintiff most prove, *inter alia*, the existence of a tying arrangement between two distinct products or services. *Community Builders, Inc. v. City of Phoenix*, 652 F.2d 823, 830 (9th Cir. 1981); *Moore v. Jas. H. Matthews & Co.*, 550 F.2d at 1212. We conclude that Hamro failed to raise a genuine issue of material fact with respect to the existence of a tying arrangement between the lease and the purchase of gasoline from Shell. The uncontroverted facts in the case establish that the lease did not impose upon Hamro an obligation to purchase gasoline from Shell. Hamro would not have violated his lease if he had bought non-Shell gasoline and marketed it under his own name. Failure to use the Shell insignia and to sell Shell gasoline would have violated the dealer agreement, which required Hamro to operate the premises as a Shell service station and to maintain representative amounts of Shell's three grades of gasoline. But the alleged tying product was the lease, not the dealer agreement. The lease did not compel operation of the premises as a Shell service station nor did it obligate Hamro to enter into or to comply with the dealer agreement.

### 3. The Trademark-Gasoline Tying Claim

■■■ Hamro contends that Shell illegally tied the use of Shell's trademark (the tying product) to the purchase of Shell gasoline (the tied product). Shell does not dispute the fact that the dealer agreement expressly granted to Hamro the right to use Shell's trademark on the condition that Hamro sell only Shell products under the trademark. In order to establish that the tie was an unlawful arrangement, however, Hamro must demonstrate that the scheme involved two distinct products. *Times-Picayune Publishing Co. v. United States*, 345 U.S. at 614, 73 S.Ct. at 883; *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1352 (9th Cir. 1982) (*Baskin-Robbins*); *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 47 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972) (*Chicken Delight*). We affirm the district court's determination that as a matter of law the Shell trademark and Shell gasoline are not separate and distinct products.

This court has held that a trademark may constitute a separate tying item. *See Chicken Delight*, 448 F.2d at 49. But not all trademarks are treated alike. This court has suggested that trademarks fall into two distinct functional categories: (1) trademarks that identify the source of a product and (2) trademarks that warrant a certain method of doing business and certain quality standards. *See id.* at 48–49; *accord, Redd v. Shell Oil Co.*, 524 F.2d 1054, 1056–57 (10th Cir. 1975), *cert. denied,* 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976). With the second type of trademark, the franchisee does not pass on a finished branded product, but actually prepares the product in accordance with standards specified by the franchisor. *Chicken Delight* presented the second type of trademark. The franchisees of Chicken Delight were required to purchase certain cooking equipment, mixes and packaging items as a condition of obtaining a license to use the Chicken Delight trademark. 448 F.2d at 46. We held the trademark and the tied items to be distinct and separate products. *Id.* at 49. We reasoned:

[I]t is apparent that the goodwill of the Chicken Delight trade-mark does not attach to the multitude of separate articles used in the operation of the licensed system or in the production of its end product. It is not what is used, but how it is used and what results that have given the system and its end product their entitlement to trademark protection. It is to

the system and the end product that the public looks with the confidence that established goodwill has created.

... [A]ttempts by tie-in to extend the trade-mark protection to common articles (which the public does not and has no reason to connect with the trade-mark) simply because they are said to be essential to production of that which is the subject of the trade-mark, cannot escape antitrust scrutiny.

*Id.*

With a source trademark, on the other hand, the goodwill of the trademark attaches to an individual product manufactured for or by the trademark owner. *Baskin-Robbins*, 644 F.2d at 1354. The franchisees "serve merely as conduits through which the trademarked goods of the franchisor flow to the ultimate consumer." *Id.* at 1353. *Baskin-Robbins* raised the question whether a source trademark should be considered to be a separate item for tie-in purposes. This court held that the Baskin-Robbins trademark and the ice cream products allegedly tied to the trademark were "so inextricably interrelated in the mind of the consumer as to preclude any finding that the trademark is a separate item for tie-in purposes." *Id.* at 1354. In the instant case, the Shell trademark serves as a source trademark. Thus, the nexus between the trademark and the tied product, Shell gasoline, is sufficiently close to warrant treating them as one product. Further support for our conclusion that the Shell trademark is not a separate product is found in *Redd v. Shell Oil Co.*, 524 F.2d 1054, where the Tenth Circuit was presented with a source trademark in a factual context almost identical to the one before us. In that case, a contract between Shell Oil Company and Redd, a wholesaler of petroleum products, granted Redd the right to use the Shell trademark in connection with the sale of petroleum products but prohibited Redd from selling non-Shell products under the Shell trademark. *Id.* Redd claimed that the agreement constituted an illegal tying arrangement. The court distinguished *Chicken Delight* and held that the trademark was not a separate product. *Id.* at 1056. Use of the trademark would be "a representation ... that the gasoline was Shell gasoline and thus either made by or for Shell." *Id.* at 1056–57.

We agree with the reasoning of the *Redd* court. We therefore hold that the Shell trademark in the case before us, when used in connection with the sale of gasoline, merely identified the source of the gasoline and did not constitute a separate and distinct product.

### 4. The Tires, Batteries and Automotive Accessories Claims

In his first amended complaint, Hamro claimed that Shell conditioned the lease of the premises and the grant of the Shell trademark on the purchase of Shell tires, batteries and automotive accessories (TBA). Hamro has not raised the TBA tie-in on appeal. Hamro does claim, however, that Shell's refusal to approve the assignment of a second Shell franchise to Hamro on the ground that Hamro did not purchase sufficient TBA from Shell violates section 21140.2 [1] of the California Business and Professions Code.

Hamro had negotiated the purchase of the equipment and goodwill of a service station operated by Carl Painter under a lease and dealer agreement with Shell. Both the lease and dealer agreement were assignable only with Shell's prior consent. Shell refused to consent to the assignment of the Painter lease and dealer agreement. Hamro alleged that Shell's consent was withheld because Hamro purchased insufficient amounts of TBA from Shell.

■ Even if we assume that Shell disapproved the assignment of a second Shell franchise to Hamro in order to coerce Ham-

**1.** Section 21140.2 provides:

From the effective date of this section it shall be illegal for any franchisor by any action to require a franchisee to purchase only those tires, batteries, and other automotive accessories sold by the franchisor. A franchised retail gasoline dealer may sell any tires, batteries, and other automotive accessories as may be available to him for retail sale.

Cal.Bus. & Prof.Code § 21140.2 (West Supp. 1981).

ro into purchasing larger quantities of TBA from Shell, Shell's actions as a matter of law did not violate Section 21140.2. Although the Supreme Court of California has not yet interpreted this provision, the California Court of Appeal has recognized that section 21140.2 can be the basis of an action for retaliatory eviction of a service station lessee when that eviction is motivated by the lessor-oil company's desire to punish the lessee for exercising the right to purchase tires, batteries and automotive accessories from any source. *See Mobil Oil Corp. v. Handley*, 76 Cal.App.3d 956, 966, 143 Cal. Rptr. 321, 327–28 (1978). Nevertheless, in *Witt v. Union Oil Co. of California*, 99 Cal. App.3d 435, 160 Cal.Rptr. 285 (1979), the Court of Appeal held that refusal to renew a franchisee's lease in retaliation for purchases of TBA from sources other than the lessor did not constitute a retaliatory eviction and thus did not violate section 21140.2. *Id.* at 440, 160 Cal.Rptr. at 288. The court rested its decision on the fact that the lease had terminated automatically, and thus there was no eviction. "Plaintiff had no continued expectancy in the lease that he could be deprived of by some wrongful act of Union Oil." *Id.* A fair reading of the case leads to the conclusion that retaliatory actions that deprive a franchisee of an opportunity that is not based on a legal expectancy do not violate section 21140.2. Hamro's existing lease and dealer agreement contained nothing to justify Hamro in believing that a second franchise would be granted to him. Therefore, Shell's refusal to approve the assignment of a second Shell franchise to Hamro did not violate section 21140.2. The district court properly granted summary judgment in favor of Shell on the section 21140.2 claim.

## B. Intentional Interference with Prospective Economic Advantage

Hamro claims that Shell tortiously interfered with his prospective economic advantage by refusing to consent to the assignment to him of the Painter franchise. In his complaint Hamro alleged that Shell withheld its consent because of Hamro's failure to purchase satisfactory amounts of TBA from Shell. Shell argued that its con-

duct was privileged as a good faith effort to protect its financial interest in the service station. The trial court granted summary judgment in favor of Shell on the ground that Shell's actions were justified. On appeal, the question is whether there were any genuine issues of fact with respect to Shell's motive for declining to approve the assignment.

■ An action for interference with prospective economic advantage may be maintained where the right to pursue a lawful business is intentionally interfered with either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification. *Chicago Title Insurance Co. v. Great Western Financial Corp.*, 69 Cal.2d 305, 319, 70 Cal.Rptr. 849, 858, 444 P.2d 481, 490 (1968); *Lowell v. Mother's Cake & Cookie Co.*, 79 Cal.App.3d 13, 18, 144 Cal.Rptr. 664, 668 (1978). The determination whether Shell's conduct was justified depends upon " 'a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, *considering all circumstances* including the nature of the actor's conduct and the relationship between the parties.' " *Lowell v. Mother's Cake & Cookie Co.*, 79 Cal.App.3d at 20–21, 144 Cal.Rptr. at 670 (emphasis added by *Lowell* court), *quoting Herron v. State Farm Mutual Insurance Co.*, 56 Cal.2d 202, 206, 14 Cal.Rptr. 294, 296, 363 P.2d 310, 312 (1961).

In applying this general rule, the California Court of Appeal has relied on provisions from the Restatement of Torts. *See Lowell v. Mother's Cake & Cookie Co.*, 79 Cal. App.3d at 21, 144 Cal.Rptr. at 670. Section 769 of the Second Restatement of Torts provides a specific formulation by which to judge the actions of a person seeking to influence the conduct of a business in which he or she has a financial interest. That section states:

> One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he
> (a) does not employ wrongful means and

(b) acts to protect his interest from being prejudiced by the relation.

Restatement (Second) of Torts § 769 (1979).

Shell had the requisite financial interest in the Painter property to qualify under section 769. Comment c indicates that the financial interest privileged under section 769 is "an interest in the nature of an investment," such as that of a part owner, a partner or a stockholder. *Id.*, Comment c. Shell owned the property in question and had a financial interest in receiving profits from the sale of Shell products to the franchisee. Shell did not employ any improper means. Shell simply refused to consent to the assignment.

■ The remaining question is whether Shell acted to protect its own interest. Even if a defendant has the requisite financial interest to justify invasion of another's similar interest, the defendant's conduct is not privileged when it is undertaken *solely* to harm another. *Bridges v. Cal-Pacific Leasing Co.*, 16 Cal.App.3d 118, 132, 93 Cal. Rptr. 796, 804 (1971). Other California decisions have indicated that whether an intentional interference is justified depends upon the *predominant* motive of the defendant. *Lowell v. Mother's Cake & Cookie Co.*, 79 Cal.App.3d at 22, 144 Cal.Rptr. at 670; *Culcal Stylco, Inc. v. Vornado, Inc.*, 26 Cal.App.3d 879, 883, 103 Cal.Rptr. 419, 422 (1972). The record does reveal continuous efforts by Shell representatives to get Hamro to increase his sales of Shell TBA. But the record contains no evidence from which a reasonable person could infer that Shell's sole or predominant motive in disapproving the assignment was to punish Hamro or to induce him to purchase larger quantities of Shell TBA. Hamro's deposition supports Shell's contention that the decision was based on a desire to have a franchisee who would buy Shell TBA and gasoline. By affidavit, Shell established that the rate of return on Hamro's station for 1978 was 3.7% while the rate of return on the Painter station for the same year was 10.2%. The average return on service stations in the San Jose area was 9.5%.

We therefore conclude that no genuine issue of material fact as to Shell's motive was raised. As a result, we affirm the district court's grant of summary judgment in favor of Shell on the claim for intentional interference with prospective economic advantage.

## PRICE DISCRIMINATION

■ Hamro charged Shell with unlawful price discrimination in violation of section 21200 of the California Business and Professions Code. Hamro sought damages under section 21202 of that Code. The trial court granted Shell's motion for a directed verdict on the price discrimination claim at the close of plaintiff's case on the grounds that (1) Hamro introduced no evidence that any dealer who received a lower price from Shell was in competition with Hamro, (2) Hamro offered no evidence of any causal connection between the price discrimination and his alleged injury and (3) Hamro introduced no evidence that his business was in fact injured. On appeal, Hamro argues that there was sufficient evidence with respect to the price discrimination that the jury could have found in his favor. We disagree and affirm the grant of a directed verdict in favor of Shell.

Shell admitted that from January 1, 1976 through December 1979 it sold gasoline to up to ten independent retailers at a price below that charged to Hamro. However, section 21200 prohibits price discrimination by a seller only "where the effect of such discrimination is to lessen competition, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." Cal. Bus. & Prof.Code § 21200 (West Supp. 1981). A review of the record reveals that Hamro failed to offer any evidence from which a reasonable person could conclude that Hamro was in competition with Shell's more favored customers.

Since we affirm the grant of a directed verdict on the ground that there was no substantial evidence of price discrimination between competitors, we need not address the other grounds relied upon by the trial court.

AFFIRMED.