915 F.2d 1557
 Unpublished Disposition
NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
MORTGAGE GUARANTEE & TITLE CO., Plaintiff, Appellant,
v.
COMMONWEALTH MORTGAGE CO., INC., et al., Defendants, Appellees.
 No. 90-1256.
 United States Court of Appeals, First Circuit.
 Sept. 18, 1990.
 
 Appeal From The United States District Court For The District of Rhode Island, Ronald R. Lagueux, District Judge.
 William E. Carnes, with whom Joseph A. Montalbano, and Montalbano & Montalbano, Ltd. were on brief, for appellant.
 Steven E. Snow, with whom Laurel K. Bristow, and Partridge, Snow & Hahn, were on brief, for appellees.
 D.R.I., 730 F.Supp. 469.
 AFFIRMED.
 Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, and LEVIN H. CAMPBELL, Circuit Judge.
 BREYER, Chief Judge.
 
 
 1
 Mortgage Guarantee and Title Co. ("MGT"), the plaintiff in this diversity case, sells Rhode Island residential title insurance, typically through lawyers who represent home buyers. If such a lawyer has signed a contract with MGT in advance, thereby becoming an MGT "approved attorney" or an MGT "agent," MGT will accept that lawyer's opinion letter about the state of the title, likely issue the insurance, and permit the lawyer to charge the buyer a title insurance fee, or commission, over and above the cost of the insurance.
 
 
 2
 Commonwealth Mortgage Co., which, along with its President, John Sousa, is a defendant, lends money to home buyers, taking mortgages as security. Commonwealth announced that it would not lend money where MGT insures the title. MGT filed this lawsuit, claiming that Commonwealth thereby "improperly interfered" with the existing, and potential future, contracts between MGT and its "approved" lawyers or agents. See Mesolella v. City of Providence, 508 A.2d 661, 669-70 (R.I.1986); Restatement (Second) of Torts Secs. 766-766B (1979). The district court granted summary judgment for defendants. MGT appeals.
 
 
 3
 Aside from a little information about Commonwealth's reasons for refusing to deal, the record contains few relevant facts beyond those just stated. These facts essentially set out Commonwealth's refusal to deal with MGT, which refusal, because of diminished business, may lead the attorneys to cancel, or not to renew, (what are essentially) their "distribution" arrangements. Like the district court, we tend to doubt that such a refusal, so indirectly influencing the relevant contractual relationship, could amount to an "interference" except in rather unusual circumstances. After all, in the famous case of Lumley v. Gye (the source of the "contract interference" tort) the defendant directly induced Ms. Wagner to break her singing contract and sing for him instead; he did not simply announce that he would not patronize Mr. Lumley's theatre. See Lumley v. Gye, 2 El. & Bl. 216, 118 Eng.Rep. 749 (1853). Compare Adult Film Ass'n of Am. v. Times Mirror, 97 Cal.App.3d 77, 81, 158 Cal.Rptr. 547, 549 (1979) (newspaper that refuses to accept advertising from X-rated film theatre does not thereby "interfere" with the theatre's "contractual relations" with its customers) with Gianelli Distrib. Co. v. Beck & Co., 172 Cal.App.3d 1020, 1056, 219 Cal.Rptr. 203, 224 (1985) (manufacturer's cancellation of contract with wholesaler could improperly interfere with the latter's contracts with its own distributors).
 
 
 4
 We need not explore the contours of the tort in detail, however, for at a minimum, under Rhode Island law, applicable to this diversity case, any such "interference," to be actionable must lack "justification." See, e.g., Mesolella v. City of Providence, 508 A.2d 661, 669-70 (R.I.1986); see also W. Keeton, Prosser and Keeton on the Law of Torts Sec. 129 at 983 (1984); Annotation, Liability for Interference with at Will Business Relationship, 5 A.L.R. 4th Sec. 9 at 43 (1981). And, in our view the record here requires any reasonable juror to find an exculpatory "justification" for defendants' conduct. Commonwealth introduced evidence that shows a relevant commercial motive. Its president, John Sousa, provided affidavits stating that he did not want to deal with MGT because of a prior experience with MGT's owner. At that earlier time MGT's owner and Commonwealth were both involved in an effort to take over mortgages from a bank that was failing. Sousa complained that MGT's owner had tried to make him pay too much for the mortgages, that he had tried to "shop" loans, and that he had failed to convey any gratitude for help that Sousa had provided. He said this past experience led him to conclude that he would not want to be "on the other side" of a commercial transaction involving MGT's owner. Since a mortgage lender could easily find itself with a defaulting homeowner possessing a faultily insured title, Sousa's position rests upon ordinary commercial considerations.
 
 
 5
 MGT (in the absence of any Rhode Island cases on point) cites cases from other states suggesting that what would otherwise constitute a good "justification" may be undone if the defendant's actions are motivated solely, or predominantly, by a desire to injure another, rather than from an effort to obtain ordinary commercial benefit. See, e.g., LeFevre v. Space Communications Co. (Spacecom), 771 F.2d 421, 423 (10th Cir.1985) (applying New Mexico law); Hamro v. Shell Oil Co., 674 F.2d 784, 790 (9th Cir.1982) (applying California law); see also W. Keeton, Prosser on Torts 1009-10 & n. 48 (1984). Even so, the record requires judgment for Commonwealth.
 
 
 6
 The only significant evidence in the record that tends to refute Commonwealth's commercial justification consists of a single paragraph in an affidavit of an MGT employee. In that statement the employee apparently concedes that MGT's owner may previously have tried to make Sousa pay too much for the failed bank's loan, but, he says, in trying to do so, MGT's owner "was only the emissary of a group of attorneys." The employee adds that MGT's owner did not try to shop loans, and that he would "apologize" for any prior ingratitude.
 
 
 7
 Assuming that a jury believed these statements, we still do not see how such a jury could conclude that Sousa's motives were solely or predominantly non-commercially related. To say that MGT's owner was an "emissary," or that he would now "apologize," does not refute Sousa's claim that the earlier acts led Sousa to believe he would not treat Sousa very well in the context of a business relation--at least we can find nothing in the record that explains how it does. Fear of getting involved in an adversary business relation, as we have pointed out, would seem a very common reason for not wanting to do business, say, with an insurance company. Moreover, it seems conceded that Commonwealth came away from its earlier dealings with MGT's owner feeling displeased about his conduct. That in itself would seem a perfectly good reason to refuse to deal in this context. Thus, making the most favorable assumptions about the context of MGT's "improper interference" claim, we still do not see how it could prevail.
 
 
 8
 MGT goes on to make a special argument. It says that the conduct in question is unjustified as a matter of law because a Rhode Island statute makes it unlawful for anyone "either directly or indirectly" to interfere with the home buyer's "free choice ... of an insurer." R.I.Gen.Laws Sec. 27-29-4(10) (1989). (See Appendix for full text). The short, conclusive answer to this claim is that the statute in question does not cover title insurance. The statute speaks of "insurance of any kind on the property;" it does not speak of insurance on the title. And, the statute goes on to demonstrate that this is not a technical quibble, for it speaks of "interference.... with the ... purchaser's free choice ... of an insurer which complies with the foregoing requirements." One of the "foregoing requirements," enumerated in a preceding section, is that the insurer and its agents be licensed to sell the insurance in question. Neither title insurers nor their agents need be licensed in Rhode Island. Indeed, the provision in question is in Title 27 of Rhode Island's laws, a title that concerns insurance regulation; that title mentions fifty different kinds of insurance; it nowhere mentions title insurance.
 
 
 9
 For these reasons, the judgement of the district court is
 
 
 10
 Affirmed.
 
 APPENDIX
 R.I.Gen.Laws Section 27-29-4(10) provides:
 
 11
 27-29-4. Unfair methods of competition and unfair or deceptive acts or practices defined.--The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:
 
 
 12
 .............................................................
 
 
 13
 ...................
 
 
 14
 * * *
 
 
 15
 (10) Notice of free choice of agent or insurer. Every debtor, borrower, or purchaser of property with respect to which insurance of any kind on the property is required in connection with a debt or loan secured by the property or in connection with the sale of the property, shall be informed in writing by the builder, creditor, lender, or seller, of his or her right of free choice in the selection of the agent and insurer through or by which the insurance is to be placed. There shall be no interference either directly or indirectly with the borrower's, debtor's, or purchaser's free choice of an agent and of an insurer which complies with the foregoing requirements, and the builder, creditor, lender, seller, owner, or contractor shall not refuse the policy so tendered by the borrower, debtor, purchaser, contractor, or subcontractor. Upon notice of any refusal of the tendered policy, the insurance commissioner shall order the builder, creditor, lender, seller, owner, or contractor to accept the tendered policy, if the commissioner determines that the refusal is not in accordance with the foregoing requirements. Failure to comply with an order of the insurance commissioner shall be deemed a violation of this section.