**IAP, INC. and Imported Automotive Parts, Ltd., etc., Plaintiffs,**

v.

**MERCEDES–BENZ OF NORTH AMERICA, INC., Defendant.**

**Civ. No. 79–2649.**

United States District Court, D. New Jersey.

Aug. 30, 1983.

---

**263**

Erwin K. Weitz, West New York, N.J., Lowey, Dannenberg & Knapp, New York City, for plaintiffs; Henry A. Brachtel, New York City, of counsel.

Wayne H. Samson, Montvale, N.J., Mudge, Rose Guthrie & Alexander by Donald Zoeller, New York City, for defendant.

## OPINION

BIUNNO, Senior District Judge.

This suit, filed August 31, 1979, alleges an unlawful combination and conspiracy said to be an unreasonable restraint of trade or commerce in violation of section 1 of the Sherman Act (15 U.S.C. § 1) and section 3 of the Clayton Act (15 U.S.C. § 14).

The suit is a private suit with a right of action arising under sections 4 and 16 of the Clayton Act (15 U.S.C. § 15 and § 26), with jurisdiction asserted under 28 U.S.C. § 1337.

The affidavit of Louis L. Berg, president and principal shareholder of both corporate plaintiffs, sworn to in April, 1982 (and attached to the Notice of Motion for Class Determination filed April 28, 1982) discloses that the suit here was filed as a "class action" shortly after the United States filed its own civil injunction action against the same defendant in the U.S. District Court for the Northern District of California, see par. 2 of affidavit, evidently about August 15, 1979.

Ordinarily, the period of limitation for an action to enforce a private cause of action under section 4 of the Clayton Act (15 U.S.C. § 15) is 4 years after the cause of action accrued. In this case, the filing date of August 31, 1979 would reach back to September 1, 1975.

However, the effect of another provision is to suspend the running of the statute of limitations for private civil suits for the period of time while a civil proceeding instituted by the United States is pending, and for one year thereafter. See 15 U.S.C. § 16(i).

As a consequence, a civil suit filed now may reach back 4 years from filing, not counting the time period for which the federal suit was pending plus one year. The exact dates of that period are not formally in the present record here, but from what is here (about September 15, 1979 to March 15, 1982), the indication is that such a new suit could reach back to some time in 1975 or about 8 years.

Soon after this suit was filed, there was a motion by defendant to stay it pending disposition of the suit by the United States, and a stipulation and order to that effect was made under date of January 28, 1980, with arrangements for plaintiffs here to have access (for inspection and copying) to all discovery materials in the California action by the United States.

The suit by the United States was terminated on March 15, 1982, with a Rule 41 dismissal bearing that date and filed that date (See Exh. E to notice of motion for class action determination [sic] ). Nearly a

month and a half later, on April 29, 1982, proceedings in the previously stayed action here were activated by the service and filing of a motion for class action certification.

The class described in the complaint, par. 7(a), was composed of three segments having an interest in replacement parts for Mercedes-Benz cars. These were described as:

> ... Independent [parts] distributors, allegedly deprived of the opportunity to compete freely for the sale of replacement parts to Mercedes-Benz dealers [presumably for use in or on Mercedes-Benz cars].
>
> ... Mercedes-Benz dealers deprived of the opportunity to purchase replacement parts [presumably for Mercedes-Benz cars] in a free and open competitive market.
>
> ... Consumers of repair services to Mercedes-Benz cars deprived of the benefits of free and open competition in the market of [sic] Mercedes-Benz replacement parts.

The motion for certification, however, describes a class resembling, but broader than, the first group and excluding the second and third groups, namely:

> ... All wholesale distributors of repair and replacement parts for imported automobiles in the United States.

The class described in the motion is broader than the first group to the extent that it embraces all makes of imported automobiles, yet narrower in that it is limited to wholesale distributors. As defined in the complaint the first group would have embraced independent distributors without limiting them to wholesale. As is well known, and some nationally familiar names were mentioned during the hearings, there are many automobile parts stores selling parts, accessories and supplies throughout the country and have been since the automobile came into vogue.

In any event, it was only by affidavit of plaintiff's attorney of record, sworn to July 19, 1982, that the redefinition of the class was suggested in contrast to the definition originally set out in paragraph 7(a) of the complaint filed August 31, 1979. That affidavit was filed July 22, 1982 as part of a group of papers submitted over a period of time in connection with the motion by plaintiffs for class action certification heard September 23, 1982 and continued to a date to be set. At the same time the court was informed that all claims for money damages were out of the case, and only the matter of injunctive relief remained.

The continuance of the motion was due to the court's suggestion that defendant bring on a motion for summary judgment in light of representations made at the hearing in respect to notification sent by defendant to all its dealers in this country in connection with litigation in another court (the "Technical Learning" case).

The summary judgment motion was brought on in due course, supported by a bulky volume of exhibits, for January 10, 1983. By stipulation and order filed January 6, 1983, the motion was continued to January 24, 1983, when argument was heard.

Plaintiffs filed no responding papers to meet the factual showings made by defendant on its motion for summary judgment. Instead, on January 10, 1983, plaintiffs filed a set of documents captioned "Plaintiffs' response to defendant's motion for summary judgment and plaintiffs' application pursuant to Rule 23(e), F.R.Civ.P., for an order dismissing the action." These papers consisted of an affidavit of Morris Schuller, general manager and secretary-treasurer of IAP, Inc., which expressed the view that the letter to defendant's dealers, in the *Technical Learning* case, established that defendant's dealers were not contractually required by subpart 9C of the "Standard Provisions" of the Mercedes-Benz Dealer Agreement to purchase parts solely from Mercedes-Benz. Based on that understanding, taken together with the decision to limit the case to one seeking prospective injunctive relief, it was urged that the court should not grant defendant's motion for summary judgment but instead should

direct the publication of notice to members of the redefined class, informing them that the present action had been dismissed with prejudice to the two named plaintiffs, but without prejudice to others in the redefined class who might thereafter choose to file their own independent lawsuits.

The submission closed with the request that, should the court decline to dismiss the action on the terms proposed by IAP, Inc., it should grant a reasonable adjournment or continuance of defendant's motion for summary judgment to enable IAP, Inc. to interpose papers and memoranda in opposition.

Thus, at the argument on January 24, 1983, the court had before it a motion for summary judgment that had not been met in any way, and by a submission urging a dismissal under Rule 41 for which no motion had been filed.

*Nature of the Claim*

Mercedes-Benz automobiles are one of a larger number of products, mostly automotive, manufactured by Daimler-Benz in West Germany and sold in the United States through Mercedes-Benz of North America (MBNA) to authorized Mercedes-Benz new car dealerships said to number about 400.

Each authorized dealer enters into a standard dealership contract containing a provision numbered 9C, which reads:

"Dealer shall neither sell nor offer to sell for use in connection with MB cars nor use in the repair or servicing of MB passenger cars any parts other than genuine MB parts or parts expressly approved by DBAG, if such parts are necessary to the mechanical operation of such MB passenger cars."

The term "MB parts" are defined elsewhere in the contract as "parts, accessories, assemblies and optional equipment for Mercedes-Benz cars supplied by MBNA, DBAG, or by DBNA"

Taken together, these provisions are at the core of the theory of the complaint which is that they amount to an illegal "tie" of "MB parts" to the sale of new Mercedes-Benz automobiles. In substance it is the same theory advanced by the United States in its own civil antitrust suit filed in the U.S. District Court for the Northern District of California.

The claim rests on the factual predicate that Daimler-Benz does not itself manufacture in its own plants each and every part used in the assembly of the complete vehicle, but has some number of these parts made for it to its specifications by other businesses specializing in one or another part or subassembly.

This kind of manufacturing structure, of course, is not new. From its earliest days, the manufacture of complex devices like the automobile has largely involved a process of final assembly of a complete functional automobile by the use of components, some of which were produced from raw material by the automobile manufacturer and some of which it purchased from others. This feature is characteristic of the idea of "mass production", a form of manufacturing management whose essential elements include simplification of the final product and its components, standardization and interchangeability of the individual parts comprising the whole, the use of production and machine tools to reduce the amount of individualized skilled labor, the careful arrangement of workers, machines, and materials in an organized sequence designed to produce a continuous movement of work, high volume, and all with planning and coordination of the activities in respect to both production and distribution. See, *Encyclopedia Americana,* "Mass Production".

Henry Ford is credited, in the same reference source, with the first modern application of all the elements of mass production during the years 1912–1913 at his Highland Park Plant.

The same source notes another highwater mark in achieving mass production during World War II, when Ford's Willow Run Plant achieved the continuous production of one B–24 bomber per hour.

Impressive as these highlights may be in words, they do not begin to convey the considerable complexity involved in not

only making so many cars or planes per hour, but in having them leave the production line in functional capacity suitable for their useful lives.

This does not mean that every item produced will be 100% perfect in all respects and, like the wonderful one-horse shay, remain usable in every detail for 100 years. What it does mean is that the final assembled product is sufficiently good that, given regular care, maintenance and repair, it can be expected to provide useful work at acceptable cost for some extended period of time or total use measured in distance travelled.

The extent to which a given manufacturer satisfies the buyer's expectations in that regard is one measure of the extent of the good will and reputation that manufacturer earns with those who patronize him, and potential customers as well. To the extent that these expectations are not satisfied, the patron goes elsewhere and the potential customer does not materialize.

The idea that a given make of car uses parts made for the manufacturer/assembler by others is hardly novel. The automobile business began that way and still operates that way. The balance between in-house parts and subcontracted parts is merely one instance of the workings of the management system responsible for successful mass production. The reason for this is that for a given part at a given time or place the end objective of desired quality at lowest achievable cost may be realizable only by the use of one or another part that someone else, using the same basic principles of mass production, is better equipped to produce.

Early automobiles amounted to no more than installing an engine, whether steam, electric or gasoline, into a carriage or wagon made by others. The invention of the 4-cycle Otto internal combustion engine put the others out of the race. Engineers and inventors have been trying ever since to come up with a better engine, whether Wankel or Stirling or turbine, without success so far.

The eruption of the automobile spawned countless manufacturers. There was the Hupmobile, the Locomobile, the Chandler, the Marmon, the air-cooled Franklin, the Pierce Arrow, the Reo, the Stutz, the Hudson and the Essex, and countless others. All of them made some parts and had some parts made by others, whether they were carburetors, starters, generators (later alternators), spark coils, distributors, spark plugs, transmissions and so on.

At some times, no doubt there were parts so commonly employed that they could be used in more than one make of car.

Even so, the choice has always been the manufacturer's decision in balancing the recommendation of his design engineers about what would be best, and his production engineers about what is feasible. Sometimes the choice comes down to using another's product with some modification to approach the design engineer's goal while holding the economy of the production engineer. Or, it may amount to buying some part from another but accepting only those that meet stricter tolerance variations.

The point of this basic review is twofold. One is that a saving of 10 cents per spark plug in manufacturing 1 million cars with 6-cylinder engines implies a saving on that single item of $600,000. The second is that the making of a production run for a given model year is but the end result of what must be many thousands of detailed decisions of this nature.

One point explored at argument is beyond dispute: when the buyer of a car under warranty presents the car to correct an item under warranty, the manufacturer who backs up the warranty has an absolute right to insist on the use of specified parts, and to have the work performed by skilled mechanics trained by his organization, and the antitrust laws have no application to that aspect of the business.

The reason for this is that warranty performance is at the sole expense of the manufacturer. He who pays the piper calls the tune. Having sold the car and put his reputation behind its quality and performance, the manufacturer is entitled to control all aspects of the warranty work.

Some of the argument seems to be that there is some antitrust violation lurking in the admittedly high quality of the product. In his April, 1982 affidavit on the class action motion, plaintiff's counsel generously conceded that:

"Indeed, none of the governmental or private parties which had litigated against MBNA has ever questioned the claim that MBNA makes in every print and television advertisement:

'Engineered like no other car in the world'." (Aff'd., par. 11).

The statement may be entirely true, and the claim may be too, but then other makes can truthfully advance the same claim. Each manufacturer engineers his own make of car, and since the makes differ in various respects, each is free to say that his is engineered "like no other car" in the world. If it was the intent to suggest that MB cars are the finest (whatever that means) in the world, there are competitors (who are neither governmental nor private parties litigating with MBNA) who would claim superiority for themselves, and do in various ways. At least one is used as a TV prop to sell Grey Poupon Mustard.

The defendant's motion for summary judgment is supported directly by the decision in *Pick Mfg. Co. v. General Motors Corp.* 80 F.2d 641 (CA–7, 1935), aff'd., 299 U.S. 3, 57 S.Ct. 1, 84 L.Ed. 4 (1936), reh. den. 299 U.S. 622, 57 S.Ct. 192, 81 L.Ed. 458.

Pick manufactured and sold replacement parts (the modern term is the "after market", meaning the market for parts or components after sale of a machine, device or other article as original merchandise, to an ultimate consumer). These parts were sold for use in various makes of automobiles, including those made by General Motors and, in particular, by two of its subsidiaries at the time, the Buick Motor Company and the Chevrolet Motor Company.

Since General Motors and its various subsidiaries manufactured and sold replacement, or "after market" parts for their own lines of cars, and, to some extent, for other cars as well, Pick and GM were in direct competition.

The contract between Chevrolet and its new car dealers contained a provision under which the dealer agreed not to sell, offer for sale or use second-hand or used parts, or parts not manufactured or authorized by Chevrolet, in the repair of Chevrolet motor vehicles and chassis. A like provision was in the Buick contract with Buick dealers.

Since the provision did not prevent the dealer from using parts from any source to repair any car other than the make for which he was a new car dealer, the restriction applied only to that make, and protected the manufacturers against the otherwise possible use of defective parts in repairing or making replacements in their products. As the Court of Appeals observed, "The preservation of the good will of the public is directly involved."

The corresponding provision in defendant's dealer contract is no different in substance or effect than the Chevrolet or Buick provisions dealt with in *Pick.* In fact, the provision, which is 9–C, is not as broad as in *Pick* since it is limited to "such parts as are necessary to the mechanical operation of such MB passenger cars."

There are other provisions to be read together with 9–C. Thus, 9–D forbids representing that a part is a new, genuine MB Part or a part approved by DBAG when in fact it is not, whether used by it to repair or service an MB passenger car, or sold by the dealer for use in connection with an MB car.

The provisions in 13–E, dealing with warranty service, for which defendant absorbs the cost of parts and labor, obliges the dealer to use none other than genuine MB parts or parts approved by DBAG. However, 13–F indicates that, except for warranty service, the dealer may use a part which is not a genuine MB part or one expressly approved by DBAG but must so indicate on the invoice to the customer and inform that such parts are not warranted by MBNA, and is also to inform the customer of the source of the part and of the warranty, if any, given by the supplier.

Recent hearings in Washington before the International Trade Commission [UPI newswire service 8/23/83] disclosed a growing problem with automobile parts made to sell in place of genuine parts, even to the copying of trade dress, but which are flawed counterfeits which can threaten lives.

As defendant's motion for summary judgment discloses, it has sent a letter to all its dealers which, as the court understands it, states that the dealers are free to obtain parts from sources other than MBNA, but emphasizing that parts so obtained may not be represented to customers as having been bought from or approved by MBNA or DBAG, or that either of them assumes responsibility for the quality of such parts. This fact is in no way disputed.

The *Pick* case, it is pointed out, is a Supreme Court affirmance grounded on the established rule that the Supreme Court accepts the findings in which two courts concur unless clear error is shown.

But the decision is an affirmance on the merits and is every bit as binding on lower courts as the dismissal of an appeal from a state court under 28 U.S.C. § 1257(2) for want of a "substantial" constitutional question, or any summary affirmance; and the lower courts are to adhere to the ruling "unless and until the Supreme Court should instruct otherwise." See *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); *Thurston Motor Lines, Inc. v. Jordan K. Rand, Inc.* —— U.S. ——, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983).

IAP, as noted above, never met the summary judgment motion but argued that instead of granting it, the court should dismiss the claim of the two plaintiffs with prejudice under Rule 41(a)(2), with notice to "class members" under Rule 23(e).

What was filed in response to the motion for summary judgment was an affidavit of Morris Schuller, the general manager and secretary-treasurer of IAP, Inc. He describes the other plaintiff, Imported Automobile Parts, Ltd., as the predecessor of IAP, Inc., indicating that the predecessor is no longer in business and no longer an active party plaintiff. He also indicates that IAP, Inc. had earlier decided not to pursue its demand for monetary damages (as recorded in the attorney's affidavit sworn to July 19, 1982), leaving only injunctive relief in the case.

Attached to the affidavit is a proposed order of dismissal reciting that it is pursuant to F.R.Civ.P. 23(e) and 41(a)(2), dismissing the case with prejudice and without costs as to the named plaintiffs, but without prejudice to any other members of the alleged class, and with provision for notice to be published in a trade magazine, informing such alleged class members of the disposition and stating that such members are not barred from alleging like claims.

The plaintiffs' position is presumably grounded on F.R.Civ.P. 23(e), which provides in pertinent part that:

"A class action shall not be dismissed * * * without the approval of the court, and notice of the proposed dismissal * * * shall be given to all members of the class in such manner as the court directs."

This provision is referred to as an exception to the procedure for voluntary dismissal before answer, or on stipulation of the parties after answer, under F.R.Civ.P. 41(a)(1). It does not appear as an express modification for the various bases for involuntary dismissal under F.R.Civ.P. 41(b).

There is not in the case any stipulation for voluntary dismissal, but rather, in response to the pending motion for summary judgment, an affidavit and draft order (coupled with oral argument) urging that the dismissal be ordered by the court under F.R.Civ.P. 41(a)(2).

Reliance is placed on two cases: *Smoot v. Fox*, 340 F.2d 301 (CA–6, 1964), and *Sheridan v. Fox*, 531 F.Supp. 151 (D–Pa., 1982).

*Smoot* has no application. The suit there was for defamation against a publisher, and coincidentally the complaint was verified March 9, 1964, the same day the Supreme Court decided *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and filed 12 days later on March 21, 1964. The original attorney withdrew

when the trial court denied an adjournment to accommodate an extended vacation, and trial was set for October 14, 1964. Two days before trial, the new attorney moved to dismiss with prejudice and, on a denial, sought mandamus based on abuse of discretion. The new attorney noted that under *New York Times* there could be no recovery without showing "malice" as there defined, and that this could not be done in the limited time left for preparation.

Thus, the choice there was between a 2 or 3 week trial, and a dismissal with prejudice. Since the dismissal with prejudice barred any further action, a trial with an unwilling plaintiff would be an "expensive luxury", with witnesses from all parts of the country and an overcrowded docket. On these and like considerations, the writ was issued, subject to the payment of all court costs by the plaintiff.

*Sheridan* also has no application. There, an apartment owner sued a member of a tenant's association for defamation. The defendant counterclaimed for alleged abuse of process and wrongful use of process, by the bringing of the defamation suit, under Pennsylvania law.

Plaintiff could not move for dismissal of the defamation case, whether with or without prejudice, so long as the counterclaim stood. He therefore moved for dismissal of the counterclaim on the ground that under Pennsylvania law the abuse of process counterclaim did not ripen until there had been an outcome favorable to counterclaimant. And see, on the same subject, *The Penwag Property Co. v. Landau*, 76 N.J. 595, 388 A.2d 1265 (1978).

The trial court agreed and dismissed the counterclaim. It then ordered the complaint dismissed with prejudice as plaintiff had asked.

Both cases are quite different in significant respects. Neither alleged a class under F.R.Civ.P. 23. In one, the choice was between a dismissal with prejudice and a moderately burdensome trial. In the other, an unripe claim stood in the way of a complete disposition.

■ In fact, *Sheridan* notes the rule, at footnote 22, that when a plaintiff dismisses with prejudice the defendant is not the prevailing party within Rule 54(c). A judgment for defendant on its motion for summary judgment, on the other hand, is one on which it is the prevailing party and entitled to costs unless the trial court can articulate a justification for denial, *Pearlstone v. U.S.*, 649 F.2d 194 (CA–3, 1981).

■ Aside from that element of prejudice to the defendant, which had gone to the expense of a massive preparation and presentation to support its own motion for summary judgment, there was really no pressing need to have filed this suit at all. As noted at the outset, when the complaint was filed here there was already a civil proceeding brought by the United States, the theory of which was copied here. Under 15 U.S.C. § 16(i), the pending suit suspended the running of the statute of limitations and, had that suit been successful, the judgment there would have been prima facie evidence here, 15 U.S.C. § 16(a).

Not only that, but long after a consent decree that IAP says provides all the protection it needs was entered in July, 1981 in another private suit, the *Technical Learning* case, D–Md., Civ. No. N–771443, yet in April, 1982, and a month after the suit by the United States was dismissed (March 15, 1982), IAP was asking this court to order class certification—and of a different class than pleaded in the complaint.

In addition, IAP never met the summary judgment motion. The rule is that opposing affidavits addressing the facts on which the motion rests are to be served "prior to the day of the hearing", F.R.Civ.P. 56(c); *De Long Corp. v. Raymond Intern. Inc.*, 622 F.2d 1135 (CA–3, 1980). This was not done. The procedures in civil actions are governed by the Rules, not by parliamentary maneuvers such as a motion to table or the like.

For each and all of these reasons, the pending motion for class certification is denied. Defendant's motion for summary judgment is granted. Plaintiffs' request for an order allowing dismissal with preju-

dice and without costs, but without prejudice to other alleged class members is denied.

Whether the judgment has any effect on other potential claimants is a question the court cannot decide since no other claimants are before the court. If there be any, at least the ruling here can serve to guide their attorneys in weighing the question of their certification by the signing of pleadings, under F.R.Civ.P. 11.