### The MOZART COMPANY, a corporation, Plaintiff,

### v.

### MERCEDES–BENZ OF NORTH AMERICA, INC., a corporation, Defendant.

### No. C–81–0531–MHP.

United States District Court, N.D. California.

Sept. 18, 1984.

Moses Lasky, Lasky, Haas, Cohler & Munter, San Francisco, Cal., for plaintiff.

Malcolm T. Dungan, George A. Cumming, Jr., Michael B. Flesch, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant.

## OPINION AND ORDER

PATEL, District Judge.

This is an antitrust action, presently before the court on cross-motions for summary judgment. Plaintiff The Mozart Company, successor in interest to Eurasian Automotive Products, Inc., a wholesale automotive parts distributor, brought suit against defendant Mercedes-Benz of North America ("MBNA") alleging violations of §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act, 15 U.S.C. §§ 1, 2, and 14. Mozart contends that provisions of the Dealer Agreement between MBNA and each Mercedes-Benz franchised dealer constitute a per se tying violation of 15 U.S.C. §§ 1 and 14. Plaintiff alleges additionally that MBNA conspired with the franchised dealers to boycott independent replacement parts distributors, such as Eurasian, in further violation of § 1, and also attempted to monopolize the sale in the United States of replacement parts usable in Mercedes automobiles in violation of § 2. Defendant objects to the use of a per se rule and argues that a rule of reason standard should apply in this case. Since, according to defendant, the evidence Mozart has introduced concerning MBNA's alleged conduct involving threats, coercion and intimidation would be insufficient to permit plaintiff to prevail under a rule of reason standard, defendant's motion for summary judgment should be granted.

This court has had previous occasion to deal with most of the issues raised in this litigation. In *United States v. Mercedes-Benz of North America, Inc.*, 517 F.Supp. 1369 (N.D.Cal.1981) (*"MBNA"*), after detailed consideration of the arguments raised by both parties, the court held that the per se standard applied. It then proceeded to deny both the government's and MBNA's motions for summary judgment and ordered the case to proceed to trial on "the issue of defendant's economic power and, if that be established, whether defendant can demonstrate sufficient business justification for a tying arrangement." *Id.* at 1373. At the same time, the court held that no factual dispute existed as to whether the Mercedes-Benz automobile and Mercedes replacement parts were two separate products tied together by the MBNA Dealer Agreement, or whether the agreement affected a not insubstantial amount of interstate commerce. *Id.* at 1391.

Other courts have also considered tying arrangement claims brought against MBNA. In *IAP, Inc. v. Mercedes-Benz of North America, Inc.*, 571 F.Supp. 262 (D.N.J.1983) ("*IAP*"), the court went on at some length about the history of automobile production in general and the manufacture of replacement parts in particular. *Id.* at 265–67. It then cited *Pick Mfg. Co. v. General Motors Corp.*, 80 F.2d 641 (7th Cir.), *aff'd per curiam*, 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4 (1936), which held that since "[t]he preservation of the good will of the public is directly involved," General Motors did not violate § 3 of the Clayton Act by requiring Chevrolet and Buick dealerships to sell only genuine GM replacement parts or parts authorized by GM. 80 F.2d at 643–44. According to the *IAP* court, *Pick* created an automobile replacement parts "exception" to antitrust law that, in essence, forecloses any tying claim of this sort against any automobile manufacturer. 571 F.Supp. at 167–68.[1]

In another action against Mercedes, *Metrix Warehouse, Inc. v. Daimler-Benz A.G.*, 1982-2 Trade Cas. (CCH) ¶ 64,861 (D.Md.1982) ("*Metrix I*"), the court denied both parties' motions for summary judgment for substantially the same reasons as this court did in *MBNA*. *Id.* at 72,280. Following the decision in *IAP*, however, the *Metrix* court reconsidered its earlier opinion, concluded that *Pick* was controlling precedent, and granted summary judgment in favor of Daimler-Benz and MBNA. *Metrix Warehouse, Inc. v. Daimler-Benz A.G.*, 1984-1 Trade Cas. (CCH) ¶ 65,766 (D.Md.1982) ("*Metrix II*"). Then, following the opinion of the Supreme Court in *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, —— U.S. ——, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) ("*Hyde*"), the court determined that its second opinion in the case had been "premature," concluded that *Hyde* showed the notion of a *Pick* exception to be untenable, vacated *Metrix II*, and reinstated *Metrix I*. *Metrix Warehouse, Inc. v. Daimler-Benz A.G.*, No. N 79–2066 (D.Md. June 11, 1984) ("*Metrix III*").

Now this court must decide once again whether summary judgment should be in favor of or against MBNA. After thorough consideration of the extensive documentary evidence, memoranda, and oral argument presented by both parties, the court has concluded that it must deny both motions for summary judgment. The court has found no reason to disturb its previous determination that a per se standard should be used to test the alleged tying violation at issue here. It also remains clear that Mercedes-Benz automobiles and Mercedes replacement parts are two separate products tied together by the MBNA Dealer Agreement, and that this arrangement affects a not insubstantial amount of interstate commerce. Substantial factual disputes exist regarding whether MBNA had sufficient economic power to coerce its dealers into the tying arrangement and a conspiracy to boycott, and, if that is demonstrated, whether MBNA had sufficient business justification for its conduct. There is also dispute regarding the issue of MBNA's attempt to monopolize the sale of Mercedes replacement parts.

## I. Factual Background [2]

Defendant MBNA, since 1965 the exclusive United States distributor of Mercedes-Benz automobiles, markets its passenger cars and genuine and approved replace-

---

**1.** The specific issue before the *IAP* court was whether plaintiffs, instead of meeting defendant's motion for summary judgment, could dismiss their complaint with prejudice to themselves and without costs, but without prejudice to members of a purported class of plaintiffs which they attempted to have certified. 517 F.Supp. at 263–65. The court determined, *inter alia*, that since defendant had gone to great expense and trouble to prepare its motion for summary judgment, and plaintiffs had never met that motion as required by the Rules of Civil Procedure, defendant's motion for summary judgment would be granted. *Id.* at 269–70. The court's discussion of the nature of plaintiffs' claim and the *Pick* "exception" was therefore unnecessary in deciding the issue before it.

**2.** For a more detailed discussion of MBNA's operational structure and parts distribution system, see this court's opinion in *United States v. Mercedes-Benz of North America, Inc.*, 517 F.Supp. 1369, 1373–74 (N.D.Cal.1981).

ment parts through approximately 400 franchised dealerships.[3] Each dealer becomes party to a standard written Dealer Agreement, the second part of which contains numerous "Standard Provisions." Paragraph 9C of that part of the agreement provides:

> Dealer shall neither sell or offer to sell for use in connection with MB passenger cars nor use in the repair or servicing of MB passenger cars any parts other than genuine MB parts or parts expressly approved by DBAG if such parts are necessary to the mechanical operation of such MB passenger cars.

Part one of the Dealer Agreement defines "MB parts" as "parts, accessories, components, assemblies, and optional equipment for MB passenger cars supplied by MBNA, DBAG,[4] or DBNA."[5]

Plaintiff rests its claim of a per se illegal tying arrangement on Paragraph 9C quoted above. Mozart contends further that in connection with this arrangement MBNA coerced its dealers into a conspiracy to boycott all independent replacement parts distributors, such as Eurasian Automotive Products, and also attempted to monopolize the sale of Mercedes replacement parts in the United States.

## II. *The Applicable Standard*

In *MBNA*, defendant's primary arguments in favor of its own motion for summary judgment were that "because of the nature of its franchise [arrangements], per se tying standards are inapplicable and that a rule of reason is the appropriate standard for determining restraint of trade." 517 F.Supp. at 1374. Even though

this court determined in that action that a per se tying standard did indeed apply, MBNA repeats the same argument in this proceeding, contending that the cases of *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) and *Jefferson Parish Hospital Dist. v. Hyde, supra,* plus a series of franchise/trademark cases decided by the Court of Appeals for the Ninth Circuit, compel a different result. According to Mercedes, these cases, taken together, stand for the proposition that tying arrangements are not per se illegal unless they are imposed upon the ultimate consumer. This means, contends defendant, that the law of tying essentially has no application to exclusive dealing arrangements between franchisors and franchisees. These remarkable conclusions do not find support in the authority MBNA cites. Neither *GTE Sylvania* nor *Hyde* provides a basis for the argument that a per se standard should not apply in this case, and the Ninth Circuit cases relied upon only support the theory that MBNA "may condition the sale of the passenger *car* on use of the Mercedes-Benz trademark." *MBNA*, 517 F.Supp. at 1374 (emphasis in original).[6]

As this court pointed out in *MBNA, GTE Sylvania* essentially overruled *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) and criticized the *Schwinn* court for departing from a long line of authority treating vertical restrictions as subject to the rule of reason and for adopting the per se rule without performing the analysis re-

---

**3.** This case deals only with replacement parts. It is not argued nor could it be that parts for original use are separate products. Furthermore plaintiff's claim does not involve warranty parts. (Pl.'s Mem.Supp.Summ.Judgment, at 48; Pl.'s Reply Mem., at 23).

**4.** Daimler-Benz A.G., the manufacturer of Mercedes automobiles, trucks, and other vehicles, and their replacement parts.

**5.** Daimler-Benz of North America, Inc., the exclusive United States importer of DBAG products.

**6.** These cases, *California Glazed Products, Inc. v. Burns & Russell Co.*, 708 F.2d 1423 (9th Cir.) *cert. denied,* — U.S. —, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); *Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau,* 701 F.2d 1276 (9th Cir.) *cert. denied,* — U.S. —, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983); *Hamro v. Shell Oil Co.,* 674 F.2d 784 (9th Cir.1982); and *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348 (9th Cir.1982) all consider whether the products involved in the alleged tying arrangements were "separate products," not whether a per se standard applied. These cases are therefore discussed, *infra,* in the "separate products" section.

quired by *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). While some may have believed *GTE Sylvania* argued the Supreme Court's abandonment of the per se rule, *Hyde* certainly has dispelled that notion insofar as tying arrangements are concerned. Unlike its observation in *GTE Sylvania* that some vertical restrictions have an economic benefit, the court in *Hyde,* using a *Northern Pacific* analysis, announced its continuing belief that most tying arrangements are inherently anticompetitive.[7] Furthermore, application of the per se rule to tying arrangements has a thirty-seven year history. By contrast the per se rule was short-lived in vertical restriction cases. Moreover, the reasoning of the *GTE Sylvania* opinion gives no hint that the per se rule "long ... applied to tying arrangements because of 'their pernicious effect on competition and lack of any redeeming virtue' " was no longer to be applied to those cases. *MBNA,* 517 F.Supp. at 1377 (quoting *Northern Pacific Ry. Co.,* 356 U.S. at 5, 78 S.Ct. at 518). Defendant's assertion that *GTE Sylvania* somehow upsets established tying law is therefore clearly without foundation.

Mercedes nevertheless contends that *Hyde* all but forecloses the use of a per se standard in tying cases. The case holds, according to defendant, that a per se standard can be used only if the alleged tying arrangement is shown, through market analysis, to impose an actual restraint on the ultimate consumer's freedom of choice.

This argument mischaracterizes the holding and reasoning of the case.[8] In fact the court could not have made it clearer: "It is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and are therefore unreasonable 'per se.' "

104 S.Ct. at 1556. The essential characteristic of such an arrangement, the Court continued, is the seller's power to "force" a purchaser to do what he would not do in a purely competitive market. When it is "probable" that a consumer would be "forced" into the purchase of the tied product because of the seller's "market power" in the tying product market, per se condemnation, which is by definition "condemnation without inquiry into actual market conditions," is warranted with respect to the arrangement. *Id.* at 1558–60. Such market power can be demonstrated, the Court noted, by a showing that the "seller's share of the market is high" or by evidence that he "offers a unique product that competitors are not able to offer...." *Id.* at 1560–61. The alleged tying arrangement at issue in *Hyde* was an exclusive contract between the hospital and a firm of anesthesiologists that provided for all anesthesiological services offered by the hospital to be performed by the firm. *Id.* at 1554–56. Because there was no showing that the hospital had any probable forcing power in the tying product market of hospital services, the per se standard was not applicable in that case. *Id.* at 1561–67.

*Hyde* thus makes no change in the law concerning the use of a per se standard in tying cases. The three-part test articulated by this court in *MBNA* continues to have validity. *See Digidyne Corp. v. Data General Corp.,* 734 F.2d 1336, 1338 (9th Cir.1984). There is also no indication in *Hyde* or in any other authority that tying analysis is only relevant when the tie is imposed on the ultimate consumer. The alleged tie-in in *Hyde* was imposed on the consumer of hospital services, and was therefore analyzed from that perspective. Nothing in the case suggests that all tying cases must be analyzed from that point of

---

7. Justice O'Connor argued forcefully that tie-ins have economic utility. However, she could persuade only three other members of the Court to join her. In her rationale she relied in part on the reasoning of Justice White in *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (*"Fortner I"*). Justice White, however, joined with the *Hyde* majority in upholding the per se rule.

8. Defendant's reading of the Court's opinion is based largely on the concurring opinion of Justice O'Connor, which, although MBNA disagrees, clearly is at fundamental variance with the opinion of the Court regarding the continued validity of per se analysis. *See,* 104 S.Ct. at 1569, 1576 (O'Connor, J., concurring).

view, and no other cases impose that criterion. In *Anderson Foreign Motors, Inc. v. New England Toyota Distributor, Inc.*, 475 F.Supp. 973 (D.Mass.1979), plaintiff automobile dealers contended that a requirement by Toyota that they use Toyota delivery services in order to purchase Toyota passenger cars was an illegal tying arrangement. Agreeing that the dealers were the appropriate consumers from whose perspective the tie should be analyzed, the court concluded that the plaintiffs should be allowed to go to trial on their claim, noting that "dealer freedom of choice is an important value protected by tie-in law." *Id.* at 984. *Accord, Grappone, Inc. v. Subaru of New England, Inc.*, 534 F.Supp. 1282, 1289 (D.N.H.1982); *Joe Westbrook, Inc. v. Chrysler Corp.*, 419 F.Supp. 824, 835 (N.D.Ga.1976).

In *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207 (9th Cir.1983), Mobil dealers contended that the parent company had, among other things, coerced them into a tying arrangement that required them to purchase other Mobil products in addition to gasoline in order to retain their dealerships. The court viewed the evidence to indicate that "Mobil dealers were used as captive consumers of Mobil products," and were therefore victims of an illegal tying arrangement. *Id.* at 1211.

Finally, in the recent case of *Digidyne*, the court determined that defendant Data General's refusal to license a software system except to purchasers of its "central processing units" was an illegal tie. 734 F.2d at 1338. Data General sold these materials "primarily to original equipment manufacturers ("OEMs") who combine them with application software ... to create a complete computer system for resale." *Id.* at 1342. The tie was therefore imposed on these OEMs, not on the ultimate consumer of the finished computer product. *Id.* at 1342–44. Thus, defendant's "ultimate consumer" argument is without merit.

*Hyde* also appears to put to rest any possibility that *Pick* creates an "automobile replacement parts exception" to antitrust

tying law. In *MBNA*, this court suggested that "the law of tying has evolved substantially since 1935 and ... the considerations relied on by that court are more properly construed as possible arguments for a business justification defense rather than as reasons mitigating against the application of a per se standard." 517 F.Supp. at 1376. As noted above, the *IAP* and *Metrix II* decisions have since appeared to give some new vitality to *Pick*. This is not the case, however. The discussion of *Pick* in *IAP* was dictum unnecessary to the result the court reached.[9] What is more, the court relied for this dictum solely upon *Pick* without any discussion of the lengthy history of tying cases after *Pick*. *Pick* was decided in 1935 and affirmed by the Supreme Court in 1936. Adoption of the per se rule in tying cases did not take place until 1947 when the Supreme Court decided *International Salt Co. v. United States*, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947). Since *International Salt* there have been substantial developments in the law of tying and application of the per se rule. All of this was inexplicably ignored by the *IAP* court.

The *Metrix II* court reconsidered its opinion regarding *Pick* after *Hyde* was decided, and issued *Metrix III*, which succinctly states that "*Jefferson Parish [Hyde]* concisely summarizes the state of tie-in law, and leaves no room for the so-called *Pick* 'exception.'" *Id.* at 3. *Pick* clearly has no current application other than shedding light on the business justification defense explained below.

### III. *Per Se Tying Standard*

Given the continued vitality of the per se standard as applied to tying cases, it remains to be determined whether the arrangement at issue in this case is an illegal tie which warrants per se condemnation. As this court noted in *MBNA*, a plaintiff must make three important demonstrations in order to establish a per se illegal tying arrangement:

**9.** *See*, note 1, *supra*.

"1. Two separate products with the sale of one conditioned on the purchase of the other;

"2. A seller with sufficient economic leverage in the tying market to appreciably restrain competition in the tied product market; and

"3. A tie-in affecting a not insubstantial amount of interstate commerce."

517 F.Supp. at 1378 (citations omitted); *see also Digidyne*, 734 F.2d at 1338. Other cases have suggested an additional requirement: that some "modicum of coercion" be exerted upon the purchaser of the tied product by the seller of the tying product. *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc.*, 732 F.2d 1403, 1407 (9th Cir.1984); *Roberts v. Elaine Powers Figure Salons, Inc.*, 708 F.2d 1476, 1479 (9th Cir.1983). If the plaintiff establishes the above elements, defendant may defend itself "by an affirmative showing of business justification." *MBNA*, 517 F.Supp. at 1378; *see also Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1217 (9th Cir.1977) (*"Moore I"*).

The development of the coercion aspect is less than clear. In attempting to characterize it, one court suggested that tying law is "a kind of semantic shell game." *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1223 (3d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). Some courts have looked at coercion in terms of whether the two products were, in fact, tied together, i.e., whether the purchaser was required to buy the tied product in order to get the tying product. *Id.* at 1224. Other have examined it in terms of market power, concluding that coercion is likely if a seller has a patent, a unique product or a substantial market share. *See Robert's Waikiki*, 732 F.2d at 1407.

■ Under whatever rubric, coercion is a necessary element of an illegal tying arrangement. From the early days of per se application the rule has been that when a buyer is free to purchase the product

separately there is no coercion. *Northern Pacific Ry. Co.*, 356 U.S. at 6 n. 4, 78 S.Ct. at 518 n. 4. This year in *Hyde* the Supreme Court emphasized the need for some coercion holding that the per se rule may only be used "if the existence of forcing is probable." 104 S.Ct. at 1560. However, the Court goes on to evaluate it in terms of market power, saying that "the likelihood that market power exists and is being used to restrain competition in a separate market is sufficient to make per se condemnation appropriate." *Id.* at 1561. From all this it is possible to conclude that the likelihood of some coercion must be shown and that ordinarily if the purchaser must purchase the tied product in order to get the tying product and the seller has market power in the tying product coercion may be presumed. For the reasons explained in subparagraph A.2 and subparagraph B below, plaintiffs have clearly established the "modicum of coercion" necessary to invoke the per se standard. Thus the court finds coercion based on the Dealer Agreement and the fact of its acceptance by a large number of dealers who have stated they believe they had no choice. That evidence, while sufficient to show forcing is likely, is not sufficient to meet the more rigorous requirement of market power sufficient to impose significant restraints on competition in the tied product market.[10]

## A. *Separate Products Tied Together*

### 1. *Two Separate Products*

■ In *MBNA*, defendant contended that the Mercedes-Benz passenger car and its replacement parts were not separate products. In making this argument it relied upon a number of authorities, but principally *Principe v. McDonald's Corp.*, 631 F.2d 303 (4th Cir.1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981), which held that McDonald's franchisees could be required to operate only on premises leased to them by the parent company. This was not an illegal tying arrangement, reasoned the court, because "the challenged aggregation is an essential ingredi-

---

**10.** The court in *Moore I* also noted that the seller of the tying product should have an economic interest in the tied product. 550 F.2d at

1216. MBNA clearly has an economic interest in the allegedly tied replacement parts. *MBNA*, 517 F.Supp. at 1378 n. 10.

ent of the franchised system's formula for success," making the franchise and the premises lease "a single product." *Id.* at 309. MBNA contended that the Mercedes replacement parts arrangement was like the McDonald's lease requirement, since "the purchase of MBNA replacement parts is an 'integral component' of its [MBNA's] franchised business method." *MBNA*, 517 F.Supp. at 1380.

This court rejected that argument, noting that while the McDonald's arrangement was essential to the company's purpose of providing fast food products, the basic purpose of a Mercedes-Benz franchise was the distribution of Mercedes-Benz passenger cars, not Mercedes replacement parts. *Id.* at 1380–81. It was held that "[t]here is nothing inherent in the Mercedes-Benz franchise or trademarked automobile that prevents . . . replacement parts from being provided from non-approved sources." *Id.* at 1381. Notwithstanding this reasoning, defendant, citing a number of recent trademark/franchise cases that essentially stand for the same proposition as *Principe*, renews the same contention here. This court must again reject it.

MBNA relies principally on *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348 (9th Cir.1982). In that case, ice cream store franchisees contend that "Baskin-Robbins ice cream products are unlawfully tied to the sale of the Baskin-Robbins trademark." *Id.* at 1351. The court rejected this claim. Distinguishing between a "business format" franchise system and a "distribution" franchise structure, it noted that while a "business format franchise is usually created merely to conduct business under a common trade name," with the distributor franchise "the franchised outlets serve as conduits through which the trademarked goods of the franchisor flow to the ultimate consumer." *Id.* at 1353. Since "the Baskin-Robbins trademark merely served to identify the ice cream products distributed by the franchise sys-

tem," the ice cream and its trademark were not separate products, and tying law therefore had no application to the case. *Id.* at 1354.

None of that is relevant to this case. MBNA vigorously insists that *Krehl* stands for the proposition that "the law of 'tying' has no application at all to exclusive dealing arrangements used by manufacturers in the distribution of products to consumers through retail outlets displaying the manufacturer's trademark" (Def.'s Brief Opp. Summ. Judgment at 27), and that MBNA can therefore require its franchised dealers to sell only genuine or approved Mercedes replacement parts. This reasoning mischaracterizes *Krehl.* The court in that case said tying law did not apply to that particular situation because the purpose of the franchise was to distribute the trademarked ice cream; the trademark and the product it identified were therefore not separate. The purpose of a Mercedes-Benz franchise, as this court previously held, is the sale of Mercedes-Benz automobiles. *MBNA*, 517 F.Supp. at 1381. The Mercedes-Benz passenger car and its trademark are therefore not separate products. That reasoning could not be extended to cover any and all other products a franchisor may wish to distribute through a franchisee, however, without swallowing the whole of antitrust tying principles. Indeed, such a state of affairs would make it possible for MBNA or any other franchisor to require its franchisees to distribute "any product it decided to manufacture," whether or not those products were essential to the purpose of the franchise. *Id.* at 1380. *Krehl* cannot be read to support such a result.[11]

The other cases cited by defendant are likewise unavailing. In *Hamro v. Shell Oil Co.*, 674 F.2d 784 (9th Cir.1982), a Shell service station operator alleged that the requirement that he purchase Shell gasoline in order to obtain a Shell franchise was an illegal tying arrangement. *Id.* at 786.

---

**11.** Defendant makes much of the argument that since a Mercedes franchise is a "distribution" franchise rather than a "business format" franchise, *Krehl* and the other franchise cases apply to this litigation. As has been clearly demon-

strated, Mercedes passenger cars and their replacement parts are separate products; these arguments about the format of the franchise aid MBNA not at all with respect to the sales of replacement parts.

In rejecting the claim, the court merely determined that the Shell trademark and the gasoline the franchise had been established to distribute were not separate products. *Id.* at 787–88.

In *California Glazed Products, Inc. v. Burns & Russell Co.*, 708 F.2d 1423 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983), a trademark licensee who manufactured finished masonry blocks alleged that an agreement requiring it to purchase from the licensor the trademarked ingredients to finish the blocks was an illegal tie. *Id.* at 1426. The court rejected the claim, holding that since the license existed for the purpose of distributing the trademarked ingredients, those ingredients and its trademark were not separate products. *Id.* at 1427–30.

In *Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau,* 701 F.2d 1276 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983), the assignee of the claims of a number of individual pharmacies contended that a health insurance provider's policy of dispensing drug benefits only through its own pharmacy was an illegal tying arrangement. *Id.* at 1284. The court held that this arrangement came within the "business of insurance" exception to antitrust law provided by the McCarran-Ferguson Act, and was therefore not an illegal tie. *Id.* at 1284–87. Plaintiff alleged further, however, that the requirement that subscribers to the health plan exercise their drug benefits only at the provider's pharmacy also constituted an illegal tying arrangement. *Id.* at 1288–89. The court rejected this claim, holding that since the subscriber's "purchase of drugs in the required manner was the consummation of the pharmacy benefit, not an unwanted and unnecessary product tied to the desired product," the pharmacy benefit and the restriction on the use of pharmacy services were one product. *Id.* at 1289–90.

Some comments the *Klamath* court made are relevant to the present action. Referring to the "function of the aggregate" test articulated in *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), the court said that "[s]eparateness is determined in part by whether the products are normally sold or used as a unit and whether their joint sale effects savings beyond those of combined marketing. [Citation to *Siegel,* 448 F.2d at 48.] The critical factor is the extent to which a producer's offerings are in response to independently structured consumer demand." 701 F.2d at 1289. The Supreme Court has defined the two-product inquiry as whether there is a "sufficient demand" for the purchase of the tied product separate from the tying product "to identify a distinct product market in which it is efficient to offer" the two separately. *Hyde,* 104 S.Ct. at 1563 (citing approvingly this court's earlier decision in *MBNA* as well as *Siegel*). *See also Digidyne,* 734 F.2d at 1339.[12]

It remains undisputed in this action that "MBNA has separate personnel and price lists for new car and replacement part sales," and that "[m]any replacement (as well as original) parts are manufactured by outside suppliers." *MBNA,* 517 F.Supp. at 1380. It is also clear that there is a demand for Mercedes replacement parts separate from the demand for the Mercedes-Benz passenger car itself. This court therefore finds, for a second time, that the Mercedes-Benz automobile and its replacement parts are separate products.

### 2. *Products Tied Together*

■ No tying arrangement exists, however, unless it is also demonstrated that the

---

**12.** Defendant argues that *Siegel* is an "odd-ball" case that is a singular exception to the rule established in the franchise/trademark cases. *Siegel* cannot be dismissed so easily. The Supreme Court saw fit to treat *Siegel* approvingly in *Hyde* when the Court included it in an enumeration of cases consistent with its two-product analysis. 104 S.Ct. at 1563 n. 35. The tied products in that case were clearly not central to the purpose for which the franchise had been established, and thus were part of an illegal tie-in. The replacement parts at issue in this case are also not central to the purpose of the Mercedes franchise. If other elements are demonstrated, they also may be shown to be part of an illegal tie.

purchase of the tying product is conditioned on the purchase of the tied product. In *MBNA*, this court determined that the "express wording of the Dealer Agreement" tied the purchase of Mercedes-Benz passenger cars to the purchase of MBNA-supplied replacement parts. 517 F.Supp. at 1381–84. It so concludes again now.

Defendant previously argued that notwithstanding the language of Paragraph 9C of the Dealer Agreement, the understood practice is that "dealers are free to purchase non-Mercedes-Benz parts and that [this] evidence of the parties' understanding should be controlling." *Id.* at 1381. Defendant repeats that argument here, with the additional contention that two other provisions of the Dealer Agreement, taken together with Paragraph 9C, demonstrates the lack of a tie between the Mercedes-Benz automobile and its replacement parts.

Paragraph 9D of the Dealer Agreement provides:

> Dealer shall not represent as new, genuine MB parts or as parts approved by DBAG any parts used by it in the repair or servicing of MB passenger cars, which are not in fact new, genuine MB parts or parts expressly approved by DBAG or MBNA.

Paragraph 13F of the Agreement provides: [13]

> If Dealer sells for use in the repair of any MB Product any parts which are not genuine MB Parts or parts expressly approved by DBAG or MBNA, Dealer will advise the purchaser by appropriate written notice on the Invoice that such parts are not genuine MB Parts supplied by MBNA and are not warranted by MBNA. Dealer will also, by appropriate written notice on the Invoice, advise the purchaser of the source of such parts and of the warranty, if any, given by the supplier of such parts.

According to defendant, since Paragraph 9D provides for disclosure by the dealer of the use or sale of any non-MBNA parts, "[i]f Paragraph 9C compelled exclusive dealing with MBNA, Paragraph 9D would be to no purpose at all." (Def.'s Brief Supp.Summ.Judgment, at 14). Moreover, MBNA continues, the basic, "implicit" purpose of Paragraphs 9C and 9D is to provide for "full and conspicuous disclosure"; Paragraph 13F is the "explicit" declaration of that purpose. *See, id.* And, in any event, continues defendant, 9C is, in practice, irrelevant, since "dealers interpret [it] (as well as the other provisions of the Agreement) in various ways, or they simply ignore it. Some do not know of it; others interpret it as going only to 'safety related' parts; all feel free to overlook it." *Id.* at 15. In sum, contends MBNA, all 9C does is require dealers to "buy some MBNA parts as a condition of the privilege to display the trademark." *Id.*

None of these arguments is sufficient to convince this court to alter its previous determination of this question. Notwithstanding any other provision of the Agreement, Paragraph 9C clearly forbids the use or sale of non-genuine or unapproved replacement parts "if such parts are necessary to the mechanical operation of such MB passenger cars." That has nothing to do with "full and conspicuous disclosure"; it clearly prohibits dealers from using or selling certain equipment.

It is also clear that these three provisions deal with different types of replacement parts. While Paragraph 9C pertains only to parts "necessary to the mechanical operation" of the car, Paragraphs 9D and 13F, which do not contain this limiting language, clearly pertain only to those non-genuine parts that 9C does not prohibit dealers from using. Thus, Paragraph 9C cannot be read into superfluity or given interpretations its language will not bear, as defendant would wish; if it had no purpose, it would not be in the Agreement.[14]

---

**13.** This provision was added to the Agreement in 1983.

**14.** The fact that MBNA earlier considered and then rejected a less restrictive version of Paragraph 9C indicates that the provision was not intended to be without effect. *See,* "Business Justification" section, *supra.*

Defendant's further attempt to scuttle 9C by arguing that the dealers either interpreted it to suit their own purposes or ignored it entirely is also without merit. Even if the dealers did feel free to ignore the provision—and there is substantial evidence to the contrary—the fact of the existence of tying language is enough to evidence a tie. As this court previously noted, such language by itself has considerable "coercive potential," and evidence that it was actually enforced is not necessary to show a tie-in unless "the contract itself does not demonstrate a formal tying agreement." *MBNA*, 517 F.Supp. at 1381–82 and n. 17; *see also Northern Pacific Ry. Co., supra*, 356 U.S. at 11–12, 78 S.Ct. at 521–522; *Ungar v. Dunkin' Donuts of America, Inc., supra*, 531 F.2d at 1224. Since Paragraph 9C clearly does contain tying language, the fact that some dealers may have ignored it does not defeat the existence of a tie.

The fact that Paragraph 9C applies only to those parts "necessary to the mechanical operation" of the car also does not defeat the existence of a tie. In *MBNA*, this court noted that this language was ambiguous, rendering it impossible for the dealers to know what parts were covered in the proscription. There was also considerable evidence suggesting that the phrase referred, in practice, to virtually the entire automobile. *Id.* at 1382 and nn. 18–19.[15] These factors led the court to conclude that the limiting language did not alter the explicit tying arrangement the provision imposes, and it sees no reason to change that determination now.

It is true that Paragraph 9C permits the use of outside parts if they have been "expressly approved" by DBAG. As this court has noted, the existence of an illegal tie-in may in fact be defeated if an actual "approved source" clause and approval mechanism exist. *Id.* at 1382–83. The court determined, however, that no such procedures were available to Mercedes dealers, and the hint in 9C at some possible approval mechanism was therefore illusory. *Id.* at 1383–84. The court has been given no reason to find otherwise now.

For the foregoing reasons, the court is constrained to conclude, for a second time, that the Mercedes-Benz automobile and its replacement parts are separate products tied together by Paragraph 9C of the MBNA Dealer Agreement.[16]

## B. *Sufficient Economic Power*

■ The second factor in determining the existence of a per se illegal tying arrangement is whether "the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market." *Hyde*, 104 S.Ct. at 1559. The use of a per se standard is, indeed, appropriate only if "the existence of forcing is probable," i.e., there exists a "substantial potential for impact on competition" resulting from the economic power of the seller. *Id.* at 1560. This standard can be met if the plaintiff makes one of the following showings:

1. The seller has a "high" share of the tying product market, *id.;*

2. The tying product is a unique product that the seller's competitors are not able to offer, *id.* at 1560–61;

---

**15.** MBNA officials still appear to consider parts "necessary to the mechanical operation" of the Mercedes car to include virtually the entire car. *E.g.* (Stoehr Dep. at 249–54, Pl.'s App. II).

**16.** Defendant argues that since plaintiff in its damage study admits that BMW imposed no tying arrangement on its dealers, and BMW has in its dealer agreement a provision similar to Paragraph 9C, plaintiff in effect admits that MBNA is not acting in restraint of trade. (Def.'s Brief Supp.Summ.Judgment, at 4, 12, 13, 23, 24, 37). This argument misconstrues the import of the damage study and plaintiff's use of it.

The damage study deals specifically with impact, something that is not at issue in this proceeding. The study took as an assumption the belief of the former officers of Eurasian Automotive Parts that "[w]hereas MBNA was coercing the Mercedes-Benz dealers to eliminate outside purchases, and insisting that the dealers had agreed not to buy except from MBNA and that they honor their agreement 'or else,' BMW employees were not coercing the BMW dealers." (Pl.'s Brief Opp.Summ.Judgment, at 30–31). The provision in the BMW agreement is thus of no import in analyzing whether MBNA's products are tied together.

3. A substantial number of consumers have accepted the tie-in and no factor other than the economic power of the seller explains that acceptance. *MBNA*, 517 F.Supp. at 1384; *see also, Hyde*, 104 S.Ct. at 1561 n. 26 (quoting *Northern Pacific Ry.*, 356 U.S. at 7–8, 78 S.Ct. at 519–520).

Plaintiff bases its argument primarily on the second, or "uniqueness" factor, though it does suggest that the third factor is also met here.[17]

As this court held in *MBNA*, a showing of uniqueness is made by the plaintiff if:

... it can show that the alleged tying product, the Mercedes-Benz automobile, is sufficiently unique to give defendant a competitive advantage in the tying product market. If the tying product is sufficiently desirable to consumers or is a product not easily replicated or commonly available, then the producer of the tying product is likely to have sufficient leverage to restrain the tied product market.

517 F.Supp. at 1385–86 (citations omitted). Some courts have held that this demonstration can be made when a seller has economic power by virtue of a patent or a copyright in the tying product. *See, e.g., United States v. Loew's, Inc.*, 371 U.S. 38, 45–46, 83 S.Ct. 97, 102–103, 9 L.Ed.2d 11 (1962). In *Northern Pacific Ry.*, the Court held that the railroad's vast land holdings gave it a unique bargaining position sufficient to establish the requisite economic power. 356 U.S. at 7–8, 78 S.Ct. at 519–520. Although the ownership of a trademark "is not conclusive of economic power," *MBNA*, 517 F.Supp. at 1386, some courts have held that a franchisor's trademark control over a common product confers sufficient economic power to establish a tie. *E.g., Siegel v. Chicken Delight*, 448 F.2d at 49–50.

Mozart contends that such factors as the special advantages a Mercedes dealer enjoys and the alleged technological superiority and immense prestige of the Mercedes-Benz passenger car make this automobile and the opportunity to distribute it so uniquely valuable that its producer has power to "force" the dealers to purchase the tied product, MBNA replacement parts.[18] Defendant contends that none of this is sufficient to demonstrate uniqueness for the purpose of establishing economic power on the part of MBNA. Relying primarily on *United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) ("*Fortner II*"), MBNA argues that its product is not unique "in the antitrust sense" because Mozart has not shown that it confers on the manufacturer "something approaching the insulation of a patent or a copyright." (Def.'s Brief Supp.Summ. Judgment, at 40). The proper focus in this inquiry, contends defendant, is not the self-laudatory comments of MBNA officials, or the praises heaped upon the Mercedes-Benz passenger car by satisfied customers or automobile critics, but is rather the capacities of MBNA's competitors. Unless it can be shown that they are somehow prevented from marketing products comparable to those offered by MBNA, continues defendant, Mercedes products are not sufficiently unique to give MBNA economic power over the tying product market. *Id.*

Defendant appears to read *Fortner II* to require a producer to have something approaching a monopoly in the tying product market in order for its product to be unique. MBNA made this argument in the previous action before this court; it was rejected then, *MBNA*, 517 F.Supp. at 1386, and must be again now. *Fortner II* does contain language indicating that "the question is whether the seller has some advan-

---

**17.** Plaintiff also attempts to argue that the market dominance test is also met here, since the market for the tying product, the Mercedes-Benz passenger car, consists of the Mercedes dealers. (Pl.'s Reply Brief, at 22–23). This argument misconstrues the nature of the market dominance test. *See, Digidyne*, 734 F.2d at 1336, 1340 (9th Cir.1984).

**18.** Plaintiff bases this argument on portions of the extensive deposition and documentary evidence generated by this litigation, mostly on the deposition testimony of MBNA officials. *See,* (Pl.'s Mem.Supp.Summ.Judgment, at 12–24).

tage not shared by his competitors in the market for the tying product," 429 U.S. at 620, 97 S.Ct. at 867, and that the producer's competitors must be "in some way prevented from offering the distinctive product themselves." *Id.* at 621, 97 S.Ct. at 868 (quoting *Fortner I*, 394 U.S. at 505, 89 S.Ct. at 1259). The Court's opinion made it clear, however, that this reasoning did not impose a monopoly requirement, and that the uniqueness showing could be made "[w]henever there are some buyers who find a seller's product uniquely attractive, and are therefore willing to pay a premium above the price for the nearest substitute...." *Id.* 429 U.S. at 621 n. 14, 97 S.Ct. at 868 n. 14 (quoting Note, *The Logic of Foreclosure: Tie-In Doctrine after Fortner v. U.S. Steel*, 79 Yale L.J. 86, 93–94 (1969)). As the court in *Digidyne* noted:

> The concern is not with the restraint on competition in the tying product but on competition in the market for the tied product. What is required is not monopoly power in the tying product market, but only sufficient power to enable the seller to restrict competition in the tied product. If a seller's product is distinctive, not available from other sources, and sufficiently attractive to some buyers to enable the seller by tying arrangements to foreclose a part of the market for a tied product, the adverse impact on competition in the tied product is not diminished by the fact that other sellers may be selling products similar to the tying product.

734 F.2d at 1345. Thus, the plaintiff in that case was able to demonstrate economic power by showing that defendant's software package, arguably the best available and protected by copyright, was sufficiently unique to allow defendant to "force" purchasers of that product to also purchase other materials. *Id.* at 1340–42. This economic power, based on uniqueness, was further enhanced, in the court's view, by the fact that many of the defendant's customers had become, by virtue of their economic investment, "locked in" to the use of the tying product. *Id.* at 1342–43.

Such a strong showing has not been made by plaintiff in this case. This court previously noted that "the Mercedes-Benz passenger car is one of the world's finest automobiles and that the Mercedes-Benz trademark, a three-pointed star in a circle, is recognized worldwide for its representation of automotive luxury, performance and technology." *MBNA*, 517 F.Supp. at 1373. Plaintiff's impressive array of evidence reinforces these impressions, but does little else. A prestigious and desirable trademark can be persuasive evidence of economic power, *id.* at 1387, but this court is unwilling to determine, as a matter of law, that the prestige of the Mercedes-Benz trademark, taken together with the evidence of the product's technological, safety and luxury preeminence, bestows on MBNA sufficient economic power to force its dealers to accept an illegal tie-in. All of this evidence should be heard and evaluated by a fact-finder at trial before a conclusive determination regarding uniqueness is made.

Mozart also argues, however, that MBNA's economic power is demonstrated by the fact that no explanation other than defendant's ability to impose a tie-in could account for the acceptance of the burdensome terms of Paragraph 9C by the Mercedes dealers. Plaintiff contends that the dealers continued to purchase replacement parts from MBNA, despite the fact that independent distributors offered equivalent parts for much less, because they feared that their two-year franchise agreements would not be renewed if they did otherwise. (Pl.'s Mem.Supp.Summ.Judgment, at 24–27).

In order to make such a demonstration of economic power, plaintiff must show that a significant number of customers in the market have accepted the tie-in, and that there are no explanations other than MBNA's economic power for that acceptance. *MBNA*, 517 F.Supp. at 1385. Mozart falls slightly short on both of these counts. As in *MBNA*, plaintiff has defined the universe of potential buyers as all Mercedes-Benz dealers, and alleges that since 100% of them accepted the adverse terms, a significant number of customers accepted

the tie-in. *See, id.* Again, "there is no identified population against which to compare the 400 Mercedes dealers. Plaintiff might argue that 400 represents an appreciable number of buyers from a total population of import car dealers or of import luxury car dealers. Plaintiff has not attempted such a showing." *Id.*

Plaintiff also has not demonstrated that fear of nonrenewal of franchises is the only possible explanation for the dealers' purchase of parts from MBNA. Indeed, some dealers suggest that the "spectre of non-renewal" did not haunt them at all, and that they had other reasons for purchasing parts directly from Mercedes.[19]

At least one court has determined that since an automobile manufacturer was able to impose burdensome terms on "a significant number of buyers, *i.e.*, its dealers," the manufacturer had sufficient economic power to impose an illegal tie. *Grappone, Inc. v. Subaru of New England, Inc.*, 534 F.Supp. at 1282, 1290 and n. 21. This finding was made, however, after a trial enabled the fact-finder to fully hear and evaluate the evidence. The same procedure must occur in this case. This court therefore declines to conclude, as a matter of law, that MBNA had sufficient economic power to impose an illegal tying arrangement on its franchised dealers.

The court makes that conclusion even though there is considerable evidence that dealers were coerced into the purchase of replacement parts from MBNA. The evidence plaintiff uses to demonstrate the fact of coercion consists primarily of letters, deposition testimony, and MBNA Visitor Reports, which were filled out by MBNA field representatives after inspection tours of Mercedes-Benz dealerships. This evidence seems to indicate that at least some Mercedes dealers or their parts employees felt coerced into buying only genuine MBNA parts, if only "safety-related"

parts. Parts managers talk of being harassed by MBNA parts representatives regarding the purchase of outside replacement parts, and some evidence points to possible sanctions imposed against one dealer for his failure to abide by the company policy regarding outside purchases. Defendant's evidence essentially consists of eleven volumes of deposition testimony from numerous Mercedes dealers from around the country who say they have never felt threatened or coerced into buying replacement parts solely from MBNA. Although there is surely enough evidence here to satisfy the "modicum of coercion" requirement, this court nevertheless declines to decide the issue of economic power on summary judgment.

### C. *Effect on Interstate Commerce*

In the previous action before this court, it was determined, as a matter of law, that a not insubstantial amount of interstate commerce was affected by the alleged tying arrangement. *MBNA*, 517 F.Supp. at 1387–88. The court has been given no reason to change its previous finding, and therefore concludes, for a second time, that a sufficient amount of commerce was involved in this arrangement to satisfy this element of the per se analysis.

The court has thus far concluded that the per se tying standard applies in this case. It has also been determined, as a matter of law, that (1) the Mercedes-Benz passenger car and its replacement parts are separate parts tied together by Paragraph 9C of the Dealer Agreement, and (2) that the tie affects a not insubstantial amount of interstate commerce. The court has also determined that the issue of economic power must be decided at trial.[20]

### IV. *Business Justification*

As this court has noted, a defendant can excuse itself from an otherwise per se ille-

---

**19.** *See* (Terian Dep., Def.'s App. IX, at 1313–15).

**20.** Defendant also makes much of the argument that a private plaintiff, as opposed to the government, is somehow required, even in a per se case, to prove the entire case, including damages, in order to prevail on any point, and cannot therefore move for partial summary judgment. This argument is without substance. Relevant authority makes it clear that the per se standard is not different for private and government suits. *E.g., Hyde*, 104 S.Ct. at 1556–61; *Digidyne*, 734 F.2d at 1338, 1339.

gal tying arrangement if it can demonstrate the existence of a business justification. *Id.* at 1388. The defendant bears the burden of proving that justification. *Id.*

■ MBNA maintains that the arrangement at issue in this case is necessary to make sure that the customer "will get the real thing" in terms of new cars, service, and repairs, and is essential to protecting the quality of the Mercedes-Benz passenger car and the goodwill of the customer. (Def.'s Brief Supp.Summ.Judgment, at 1–9). Mozart contends that, on the contrary, MBNA is without business justification for the tying arrangement for two reasons: 1) a less restrictive alternative that would maintain the quality of replacement parts is available to Mercedes; and 2) in any event, the quality control argument MBNA makes is without merit, since replacement parts of appropriate design and quality are available from other sources. (Pl.'s Mem. Supp.Summ.Judgment, at 27–35).

Plaintiff's first contention is based on the fact that in drafting Paragraph 9C of the Dealer Agreement MBNA first considered, then rejected, the following version:

Dealer shall not use, sell, or offer to sell parts other than genuine MB parts or parts expressly approved by DBAG or DBNA if such parts are

(a) necessary to the mechanical operation of Mercedes-Benz passenger cars; and

(b) not equivalent in quality and design to genuine MB parts expressly approved by DBAG or DBNA.

*Id.* at 29 (quoting Armstrong *TLC* Dep. Exh. P–12, at 18–19, Pl.'s App. IV). This version, alleges Mozart, would have addressed MBNA's concerns regarding quality without conferring on Mercedes an "uncontrolled silent veto" with respect to outside parts. *Id.* at 29–30.

Moreover, plaintiff contends, MBNA does not, in any event, have a quality control problem. MBNA purchases 80% of its replacement parts from DBAG; of those parts, one-half are manufactured by DBAG, and one-half are purchased by Daimler-Benz from original equipment manufacturers ("OEMs"), who produce the parts according to DBAG manufacturing and quality control specifications. A selection of the OEM parts are subjected to a "second round" of tests by DBAG, even though they have already been tested by their manufacturer. *MBNA*, 517 F.Supp. at 1389. The remaining 20% of the replacement parts purchased by MBNA come directly from OEMs who "have met DBAG's standards for the quality of their parts and inspection procedures." *Id.* at 1389 n. 32. Mozart, citing deposition and declaration evidence, alleges that "almost all" of the replacement parts sold by Eurasian Automotive Products were manufactured by these OEMs, that Mercedes officials knew this, and that independent distributors even offered parts purchased directly from DBAG parts outlets. (Pl.'s Mem.Supp. Summ.Judgment, at 31–33). Moreover, contends plaintiff, MBNA officials had never heard of accidents caused by defective parts sold by independent distributors, and had indeed heard of no defective part sold by those distributors. In fact, according to Mozart, Eurasian had a better record with warranty claims than Mercedes, who has needed to have many "recall campaigns." *Id.* at 33–35. In sum, Mozart asserts that MBNA's quality control justification lacks merit because the parts marketed by Eurasian were, in fact, of the same quality as many of those used, and even marketed, by DBAG and MBNA.

In response, Mercedes claims that its legitimate business objective "is to wed the customer to [the Mercedes-Benz] brand of automobile" and "to keep the car in first class running order." Citing authority used unsuccessfully in its attempt to remove the case from the purview of the per se standard and place it within the parameters of the franchise/trademark cases, MBNA argues that the business of affording the customer "reliable service and quality replacement parts" is an "inseparable aspect of the business of selling new cars" and "vital to good will and competitiveness." (Def.'s Brief Supp.Summ.Judgment, at 1–6). Since, according to defendant, MBNA has no direct control over the quality and design testing of the OEMs and

other manufacturers of replacement parts, and indeed could not have such control, it has no assurance that those parts are of the requisite quality and has a legitimate fear of inferior parts coming from those sources. *Id.* at 7–9 and n. 2. Defendant also calls into question Mozart's characterization of MBNA's warranty record and recall campaigns, *id.* at 42–44, and, pointing to the allegedly faulty brake disc marketed by Eurasian in 1976, contends that some parts sold by OEMs (apparently those not intended for DBAG, but solely for the wholesale market) and other manufacturers of "copy parts" are often inferior, and "sometimes dangerously inferior in quality," to genuine DBAG parts. *Id.* at 7–9, 19–20. MBNA does admit that 20% of its parts purchases are from OEMs whose parts have not gone through DBAG's rigorous "second test," but suggests that these OEMs were superior to others, that they had never forced its dealers to buy such parts, and that MBNA "is now in the process of establishing a quality control program in the United States that will duplicate what is done in Germany." *Id.* at 45.

MBNA's argument regarding the distinction between the distribution, servicing and repair of passenger cars and the sale of other consumer goods is not without merit. *See, MBNA,* 517 F.Supp. at 1390. Indeed, this court has noted that MBNA "has an important legitimate interest in protecting its trademarked automobile and public confidence in the quality and safety of the product." *Id.*[21] The crucial question is whether the alleged tying arrangement imposed on Mercedes dealers is necessary to protect that interest. The inquiry can only be resolved in defendant's favor if MBNA can demonstrate that its quality control procedures are necessary to protect the passenger car's quality, and show that replacement parts of appropriate quality are unavailable elsewhere. *Id.*

Plaintiff has presented an impressive array of argument and evidence which strongly suggests that defendant will have great difficulty meeting its burden here. Defendant's only substantial response to that showing, beyond asserting that it has a legitimate interest in the quality of its product, is to cite the declaration of DBAG inspection director Albrecht Köster. (Köster Decl., Def.'s App. XII, at 1803–25). Köster alleges that from 1981 to 1983, numerous shipments from OEMs contained defective parts, *id.* at 1815–18, which, according to MBNA, demonstrates the need for DBAG quality control procedures. Köster also asserts that it would be impossible for DBAG to monitor the quality control procedures of the numerous OEMs, thereby rendering it impossible to know for sure whether the outside parts are of the requisite quality. *Id.* at 1823–24. As plaintiff points out, Köster's declaration deals with replacement part difficulties which took place after the time period relevant in this litigation, and his conclusions regarding the possibility of receiving quality parts from elsewhere is also subject to question.[22] MBNA also cites the deposition

**21.** Plaintiff argues that the Magnusson-Moss Warranty, Federal Trade Commission Act of 1974, 15 U.S.C. §§ 2301 *et seq.*, especially § 2302(c), is "clear demonstration of Congressional intent that tying arrangements cannot be justified on the ground of preserving goodwill." (Pl.'s Reply Brief, at 23). It is not at all clear to the court that this statute, which prohibits a warrantor from conditioning the warranty on the use of a certain product, and is specifically aimed at prohibiting "the implementation of tying arrangements by means of warranties" (Pl.'s Mem.Supp.Summ.Judgment, at 49) (quoting *Harmsco, Inc.,* 41 Fed.Reg. 34,368, 34,369 (1976)), destroys MBNA's interests discussed here. It is true, of course, that a tie cannot be imposed by Mercedes unless it demonstrates that such an arrangement is the only way the safety and quality of its product can be assured. If such an arrangement proves necessary, this statute would not prohibit it. *See, id.,* at 48 (quoting House Report of § 2302(c)).

**22.** Köster suggests that it would be economically infeasible to require DBAG to monitor all the OEMs who sell on the open market. *Id.* at 1823–24. This does not mean, however, that there are not other possible means available to insure the quality of the parts used in the Mercedes car. Perhaps some quality control system could be implemented directly ·at the dealer level. The fact that the requirement of quality control poses some problems does not excuse MBNA from doing it. Additionally, Köster and MBNA both appear to misread the import of *Volkswagenwerk A.G. v. Bundeskartellamt* (the "Federal Cartel Office"), No. KVR 8/80 (Sep-

testimony of parts manager Don Williams, who suggests that, although he does not know "for sure," some OEMs whose parts are rejected by MBNA leave those parts in Mercedes boxes and then sell them to the independent parts distributors, who then sell them to dealers in the same boxes. This, continues Williams, makes it difficult to tell, for warranty and disclosure purposes, whether the part is MBNA-approved or not. (Williams Dep., Def.'s App. I, at 77–78). This testimony is admittedly speculative and is therefore of little probative value.

As the foregoing discussion indicates, defendant has not made a sufficient showing of the need for DBAG quality control procedures or of the unavailability of quality parts from outside sources to prevail on its own motion for summary judgment. The court also declines, however, to grant plaintiff's motion for summary judgment on this issue. There are serious questions of fact in dispute on the business justification defense that preclude a grant of summary judgment for either party.

If plaintiff is able to establish the requisite economic power to impose an illegal tying arrangement, MBNA will have the opportunity to "demonstrate the necessity for its quality control procedures and the unavailability of comparable mechanically necessary replacement parts from non-MBNA sources." *MBNA*, 517 F.Supp. at 1390.

## V. *The Conspiracy and Monopoly Claims*

■ In addition to the claim of a per se illegal tying arrangement, Mozart alleges that MBNA also engaged, with its dealers, in a conspiracy to boycott independent distributors, and also attempted to monopolize, through "resale price maintenance," the sale of Mercedes-Benz replacement parts, in violation of 15 U.S.C. §§ 1 and 2. The court does not find it necessary to discuss in detail the parties' arguments regarding these claims. The main focus of

argument and dispute has been the tying allegation, and the court need do no more here than state that it declines plaintiff's invitation to grant summary judgment as to the conspiracy claim on its own motion, and also will not grant defendant's motion for summary judgment on both claims. There is sufficient dispute regarding coercion to permit the conspiracy claim to proceed to trial, and neither party has mustered sufficient argument on the monopoly claim to justify summary judgment treatment.

## VI. *Conclusion*

Based on the foregoing discussion, the court determines that since there are genuine issues of fact regarding the points raised in plaintiff's motion for summary judgment, that motion must be DENIED. Because the per se standard is applicable as to the tying count, and sufficient factual dispute remains as to the conspiracy and monopoly counts, defendant's motion for summary judgment is also DENIED.

As permitted by Fed.R.Civ.P. 54(d), the court finds that there is no substantial controversy as to the following facts:

1. The Mercedes-Benz passenger car and its replacement parts are separate products tied together by the terms of Paragraph 9C of the MBNA Dealer Agreement; and

2. The tying arrangement affects a substantial amount of interstate commerce.

This matter will proceed to trial on the illegal tying arrangement claim on the issues of:

1. Whether MBNA has sufficient economic power to restrain competition in the tied product market; and

2. Whether MBNA has a legitimate business justification for the tying arrangement at issue in this case and on the conspiracy and monopoly claims.

tember 11, 1981). The German court merely held that under German law, VW could not be required to monitor the quality control processes of the OEMs. (Def.'s App. XIV, at 2123).

Again, this does not dispose of the matter, for there could conceivably be other means of insuring the quality of replacement parts coming from OEMs.

3. On the conspiracy and monopoly claims.

IT IS SO ORDERED.